Marvin K. THOMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 81–460.

District of Columbia Court of Appeals.

Argued May 4, 1982.

Decided June 30, 1982.

---

Ramona Powell, Washington, D. C., appointed by the court, for appellant.

Evelyn E. Crawford Queen, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, and Robert F. O'Neill, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and NEBEKER and MACK, Associate Judges.

NEWMAN, Chief Judge:

Appellant Marvin Thomas was convicted by jury of unauthorized use of a vehicle under D.C.Code 1981, § 22–2204. *Inter alia*,[1] he challenges the government's argument, and the court's instruction, to the effect that an adverse inference could be drawn from his failure to call as a witness a person who observed his arrest. We hold that it was prejudicial error to authorize the argument and to give the instruction, and therefore reverse the conviction.

I

The arresting officer, James Wooten, testified for the government at trial. He established that at the time of the arrest on August 12, 1980, appellant was driving a car that had been reported stolen by Gregory Blackford. Blackford testified that the car was stolen on May 26, 1980. He said he did not know appellant, and had not authorized him to use the car. The parties stipulated that Blackford's insurer, which had acquired an interest in the vehicle by the time of arrest, also had not authorized its use by appellant.

Appellant did not contest the fact that he had used the car on August 12. He testified that he was moving the car to a new parking space at the time of his arrest, in the company of a co-worker, Ronald Golden. His sole defense was that Blackford had authorized him to use the car. He testified that Blackford had hired him to do free lance mechanical work on it. When Blackford indicated his interest in selling the car, appellant offered to buy it. Although terms were never finalized, appellant said he paid several installments toward the purchase price. By unwritten agreement, appellant was allowed to use the car as he continued to work on it and make payments.

On cross-examination, the government sought to explore the circumstances surrounding the arrest. Several questions related to Golden's presence at the scene and appellant's relationship with him.

Q   Why don't you go back over the scene with us?

You came out of the building with who?

A   Ron Golden. He was a photographer for our AV group.

Q   And you know where Mr. Golden works.

MR. FIELDS: Objection.

THE WITNESS: I don't know where he is presently employed.

THE COURT: Objection overruled.

BY MR. O'NEILL:

Q   Excuse me?

A   I don't know where he is presently employed. He worked in the RAV group. He was part of our group.

Q   He was there when the police arrived.

A   Yeah. The police were already there, just like you are standing there.

Q   There was more than one police officer.

---

1. Appellant raises several other grounds for remand or reversal, which we need not address. One is the trial court's failure to conduct an inquiry into the effectiveness of trial counsel, when counsel had submitted a pretrial motion to withdraw that appears sufficient to trigger the hearing requirement of *Monroe v. United States*, D.C.App., 389 A.2d 811, *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). He also asserts that trial counsel was in fact ineffective. Another ground is that the court's failure to grant a continuance on the day of trial, one day after the arraignment on a modified indictment, unconstitutionally denied him the opportunity to prepare his defense. Appellant also challenges the admission of evidence relating to the circumstances of his arrest and of prior crimes and bad acts, prosecutorial misconduct, and improper participation by the trial court in the adversary process.

A There was one there, giving out tickets. And then another one came up.

Q Is Mr. Golden with you today?

A No.

Q Did you ask him to be here today?

MR. FIELDS: Objection, Your Honor.

THE COURT: I overrule the objection.

BY MR. O'NEILL:

Q Did you ask him to be here today?

A I talked with him. I talked with him and stuff. And he's got another job, just recently.

Q Did you subpoena him to be here today?

A I didn't subpoena him, no.

Appellant was then questioned about what he and Officer Wooten each had done after the car was stopped. Defense counsel objected to this line of questioning on the ground that it was not material to any issue in the case. He pointed out that there was no testimony on direct other than the fact that appellant was taken to the police station. The objection was overruled, and the prosecutor was permitted to elicit testimony that the arresting officer had unholstered his gun.

Q Now after the police officer stopped you, he didn't tell you what you were being stopped for.

A He—Well, as soon as he stopped me, you know, he did everything, you know, a policeman normally do. He come up, and you know, he said, "Get out of the car," and, you know, all that.

And I just started questioning. I said, "What's happening?"

Q He didn't mistreat you at all, did he?

MR. FIELDS: Objection, Your Honor. There has been no allegation of mistreatment.

THE COURT: Did he mistreat you?

THE WITNESS: Well, I wasn't his dancing partner. He gave me a roughing at that time, to a degree.

BY MR. O'NEILL:

Q Why don't you tell us what that roughing is?

A He said, "Get out the car." He started unsnapping his Roscoe. As I got out, he spin me around on the car. He said, "You are under arrest." He started reading off a right to be quiet, "You have a right to counsel."

Golden that was with me, he was trying to figure out what was going on. He said, "What's happening, man?" Right then, a plainclothesman came upon the sidewalk, with a gun in his hand, and he was getting ready to put his gun on Golden.

He said, "What's this all about?" I said, "Golden, go get Miss Daniel." She was our director.

Q You said he unbuttoned his Roscoe. What do you mean by that?

A That's a street term for pistol.

Q What did he do with his pistol?

A He pulled it out.

Q What did you do?

A I had to look at that time.

Q Why did you have to look at it?

A I didn't have a choice.

Q Would you explain?

A I answered the question. If you sitting in a car and about ready to get out, he is standing up, and he six feet tall. You are looking at it at hip height, and you are looking all the way up.

Q So he stuck a gun in your face. Is that what you are testifying to?

A Yes.

On redirect, appellant testified that Golden had no knowledge regarding the only disputed issue in the case—whether Blackford had authorized appellant to use the car. Before appellant left the witness stand, the court examined him sua sponte to lay the foundation for a missing witness argument and instruction as to Golden.

THE COURT: I have got one final question for you, Mr. Thomas: You say you came out of the University of the District of Columbia with Mr. Golden, and you told the ladies and gentlemen of the jury that Officer Wooten put a gun in your face.

THE WITNESS: I had got in the car and pulled out.

THE COURT: Did Mr. Golden see Officer Wooten put that gun in your face?

THE WITNESS: I am sure Golden did for sure.

THE COURT: You didn't bring him today.

THE WITNESS: I talked to him on the phone. Mr. Fields tried. He got a new job as a security guard.

THE COURT: We can subpoena anybody to come to court as a witness for you or anybody else. And Mr. Golden is not here. Is that not so?

THE WITNESS: Yes, sir.

At the close of the trial, the prosecutor requested permission to argue that an inference adverse to appellant be drawn from the absence of Golden and Hildegarde Daniels.[2] Over defense objection, the court granted the request as to Golden. It also authorized a missing witness argument as to Gary Tyler, who allegedly introduced appellant to Blackford, as a person who could modify Blackford's car as he desired.

In its closing argument, the government emphasized appellant's testimony about the drawn gun and suggested that it undermined his credibility. It strongly urged the jury to infer from Golden's absence from the trial that he would not corroborate appellant's testimony about the events at the time of arrest.

You know that witnesses could have been subpoenaed here. And the Court would have told those people, "You must come." No question about it. A subpoena gets slapped on you; you appear in court.

Think about the witnesses that didn't come to court to testify. We have the man who was on the scene at the time Officer Wooten stopped the defendant.

Did he come to court? Did he tell us what happened? And wouldn't he have wanted to come to court, if he saw somebody stick a gun in someone's face for no reason at all? And that's a pretty outrageous, horrible thing, when it's unjustified.

We're not talking about somebody who is just on the street. We're talking about a person who was working in that building. That person didn't show up.

In a rebuttal argument after the defense's summation, the prosecutor again emphasized the dispute regarding the officer's gun.

He [appellant] says, "At the scene of my arrest, I had a gun stuck in my face. I was hassled. I was jostled. I never was allowed to explain a thing to the officer. The officer must have made up all of those stories."

The prosecutor also made a strong missing witness argument as to Tyler.

The court gave the following missing witness instruction as to Golden:

And then during the course of this trial too, we learned of two individuals who are not present during the course of this trial. Again your recollection controls and not mine.

My recollection of Mr. Thomas's testimony is that at the time that he was arrested Officer Wooten pulled his gun and put it up to his head and to his face.

And Officer Wooten, according to my recollection, said that he just didn't do that, he never pulled his gun. That's a matter that you the jury must resolve.

But the point of the matter is that according to Mr. Thomas' testimony, ac-

---

2. The entire inquiry into the appropriateness of missing witness inferences was as follows:

MR. O'NEILL: In closing argument, I would like to be able to argue the absence of all of the witnesses, those witnesses being the two people on the scene.

THE COURT: Well, you can argue Mr. Golden. He said he was there and saw the gun pulled. And you can argue Gary Tyler, not the lady.

MR. FIELDS: Your Honor, may I register my objection to the ruling? My position

would be, as to the arrest, that is collateral. It may bear on his credibility. It's error to allow him to argue the missing witness as to something that is not—

THE COURT: Mr. Fields, anybody that says a police officer pulled a gun and put it in his face, if it did happen, it is substantial, and it goes to credibility. That is not collateral. Your objection is overruled.

No record findings were made.

cording to the Defendant's testimony, it was somebody else there at the time that Officer Wooten arrested him who could have told us a little bit about that, and that person is Mr. Ron Goldman [*sic*]. The Defendant said that Mr. Ron Goldman was with him at the time that he was arrested.

. . . . .

[T]he law is that if a witness or witnesses who could have given material testimony on issues in this case were particularly within the power of one party in this lawsuit to produce and they were not produced or called by that party as witnesses, and their absence as witnesses has not been sufficiently accounted for or satisfactorily explained to you, then you as a jury may if you deem it appropriate to do so, infer that the testimony of those witnesses would have been unfavorable to the party which failed to produce or call them as witnesses in this case.

However no such inference should be drawn by you with regard to witnesses who were equally within the power of either party to produce.

The court also discussed the absence of Gary Tyler.

## II

■ The classic statement of the missing witness rule was made by the Supreme Court in *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). "[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Subsequent cases have defined more specifically the circumstances under which an inference from the absence of witnesses or evidence is permissible, within the framework of the two fundamental prerequisites cited in *Graves*: that the witness be able to "elucidate the transaction" such that he might be expected to be called, and that he be "peculiarly available" to the party against whom the inference is made.

■ In order for a witness to "elucidate the transaction," his testimony must be relevant and material to a disputed issue in the case. *Dent v. United States*, D.C.App., 404 A.2d 165, 170 (1979); *United States v. Young*, 150 U.S.App.D.C. 98, 104, 463 F.2d 934, 940 (1972). It must also be noncumulative, *Cooper v. United States*, D.C.App., 415 A.2d 528, 534 (1980); *Nowlin v. United States*, D.C.App., 382 A.2d 9, 12 (1978); *Anderson v. United States*, D.C.App., 352 A.2d 392, 394 n.4 (1976), and an "important part" of the case of the party against whom the inference is drawn. *Dent v. United States, supra*, at 170. Absent these conditions, the logical basis for the inference evaporates, for nothing can reasonably be inferred from the failure to call a witness who would not be expected to contribute additional pertinent facts to the trial.

■ The "peculiar availability" requirement is also essential to the reasonableness of a missing witness inference. The missing witness inference is only well-founded if "the party had the physical ability to locate and produce the witness and there was such a relationship, in legal status or on the facts as claimed by the party as to make it natural to expect the party to have called the witness." *United States v. Young, supra*, 150 U.S.App.D.C. at 107, 463 F.2d at 943. There are two aspects of peculiar availability, both of which must be satisfied. The first and most obvious is physical availability. If a witness cannot be brought to court, no factual conclusion can be drawn from the failure to produce him. In general, a witness is not physically available unless he can be located, *see United States v. Wilson*, 175 U.S.App.D.C. 173, 534 F.2d 375 (1976), and is within the subpoena power of the court, *see Wynn v. United States*, 130 U.S.App.D.C. 60, 397 F.2d 621 (1967). Thus if a party has made bona fide reasonable efforts to produce the witness without success, no adverse inference will be permitted. *Compare Nowlin v. United States, supra with Harris v. United States*, D.C.App., 430 A.2d 536 (1981).

■ But the ability to hail the witness into court is not enough. Practical availability is also required. *See Dent v. United States, supra* at 170. The party's ability to produce the witness, or his reasons for doing so, must be stronger than those of the party seeking an inference in his favor. Otherwise, an inference might just as well be drawn *against* the party who favors a missing witness inference. A finding of peculiar availability may be justified where circumstances suggest a potential bias in favor of one party, *e.g.*, where he is employed by that party, *Milton v. United States*, 71 App.D.C. 394, 110 F.2d 556 (1940).

■ Both of the factual predicates—elucidation and peculiar availability—are to be evaluated by the trial court. *E.g., Givens v. United States*, D.C.App., 385 A.2d 24 (1978). Findings that each is satisfied are necessary before a party may argue in favor of a missing witness inference or the court may give an instruction authorizing the jury to draw such an inference. *E.g., Dent v. United States, supra.*

This and other courts have noted the hazards related to the use of the missing witness inference. A primary function of jury instructions, as well as the rules of procedure and evidence, is to confine the jury's attention to firsthand testimony from those with personal knowledge of relevant facts, which may be probed on cross-examination, thereby excluding conjecture. The missing witness inference represents a radical departure from this paradigm, for it essentially creates evidence from non-evidence. The risk is always present that the jury will give undue weight to the presumed content of testimony *not* presented, and insufficient weight to that which *was* presented. *See Dent v. United States, supra* at 171; *Burgess v. United States*, 142 U.S.App.D.C. 198, 206, 440 F.2d 226, 234 (1970).

■ Accordingly, the court has discretion to refuse the instruction and argument even when the prerequisites of elucidation and peculiar availability are satisfied. *Simmons v. United States*, D.C.App., 444 A.2d 962 (1982); *Kleinbart v. United States*, D.C. App., 426 A.2d 343 (1981); *Dent v. United States, supra; Smith v. United States*, D.C. App., 343 A.2d 40 (1975); *Burgess v. United States, supra.* This discretionary decision should be guided by reference to the underlying rationale for the doctrine, by considering "whether from all circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *Dent v. United States, supra* at 171; *Shelton v. United States*, D.C.App., 388 A.2d 859, 863 (1978), quoting *Burgess v. United States, supra*, 142 U.S.App.D.C. at 206, 440 F.2d at 234.

■ Finally, even when a missing witness argument or instruction is properly made, the inference is merely *permissible.* The jury is free to give it such weight as it deems appropriate, or to reject it entirely. *See* Criminal Jury Instructions for the District of Columbia, No. 2.41 (3d ed. 1978).

■ The risks inherent in missing witness argument also justify *procedural* safeguards designed to ensure that the foundational issues are addressed *before* possibly improper inferences are suggested to the jury. The onus is not on the party against whom an inference is made to object after the fact. Rather, it is the responsibility of the party proposing the inference to seek and obtain advance permission from the court. *E.g., Dent v. United States, supra; Givens v. United States, supra.* This process should not only require the moving party to substantiate the factual basis for the inference, but provide the opposing party a timely opportunity to counter the proponent's showing of elucidation and/or peculiar availability. The court should then articulate the findings underlying the ruling. *Simmons v. United States, supra* at 964.

■ Whether an improper missing witness argument or instruction requires reversal is to be judged under the standard of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not

substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error, it is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. [*Id.* at 765, 66 S.Ct. at 1248.] Since prejudicial effect will depend largely on facts not before the court, *i.e.*, what the content of the missing testimony would have been, it is difficult for an appellate court to find the error harmless with the requisite level of certainty. Accordingly, where the defendant's credibility is a key issue and the missing witness inference goes to that credibility, an improper argument or instruction will ordinarily require reversal. *See Simmons v. United States, supra* at 965; *Coombs v. United States,* D.C.App., 399 A.2d 1313, 1318 (1979); *Haynes v. United States,* D.C.App., 318 A.2d 901, 903 (1974).

### III

■ Application of the principles just outlined shows that reversible error was committed in giving a missing witness instruction as to Golden and permitting the government to argue that the jury draw the permissible inference. The prerequisite of the missing witness' ability to elucidate the transaction is sorely absent. No one contends that Golden had knowledge material to the only relevant contested issue— whether Blackford had consented to appellant's use of the car. The only circumstance as to which Golden's testimony was allegedly needed is whether Officer Wooten pulled his gun at the time of arrest. That fact obviously does not affect appellant's liability for unauthorized use of a vehicle.[3]

Moreover, the defense could not be expected to anticipate that the drawing of the gun would be raised at trial. Appellant presented no evidence or argument alleging improper police conduct. The evidence about the gun was drawn out at the insistence of the prosecution on cross-examination, over defense counsel's strong objection. This case is thus factually very similar to *Dent v. United States, supra,* wherein no testimony had been proffered by the defense as to his specific whereabouts at any time material to the robbery. Rather, the government, through cross-examination of appellant, had elicited evidence as to his whereabouts some two hours later. Having thus set up its straw man, the government proceeded to knock it down by use of the missing witness inference. In the present case, as in *Dent,* this bootstrap approach must fail.

The government insists that the accuracy of appellant's statements on cross-examination reflect on his credibility generally, and thus on the believability of his testimony that *does* relate to the material issue of authorization to use the car. But the same could be said of *any* statement elicited from a witness, no matter how irrelevant to the case at hand. The fact that credibility is an issue, as it often is, obviously does not render the fundamental requirements of relevance and materiality nugatory. Having entered an area where it had no business being, the government then sought to compound the error by using the irrelevant testimony as the basis for a missing witness inference undermining appellant's credibility. Under such circumstances, no rational factual inference can be drawn from the absence of Golden. Since the circumstances of appellant's arrest did not bear on his criminal liability, and he did not bring those

---

**3.** This situation should be contrasted with one in which the factual issue was initially raised by defense, and bears on the ultimate issue of guilt. In *Finnegan v. United States,* D.C.App., 399 A.2d 570 (1979), for example, the court found that the missing witness could have shed light on the defendant's explanation that he was in a "high drug area" to seek employment rather than to make a drug transaction. Similarly, in *Harris v. United States, supra,* the court majority viewed the missing testimony as bearing on a material issue—the reason for the defendant's presence in the vicinity of the crime. In the instant case, evidence as to arresting officer's behavior is not probative of the defendant's liability for unauthorized use of a vehicle, and was not raised by the defense.

circumstances into contention, he had no reason to bring Golden to the trial.[4] This principle has been recognized at least since 1893, when the Supreme Court said that the missing witness inference

> does not apply to every fact in the case which it may be in the power of the defendant to prove. He is not bound to anticipate every fact which the government may wish to show in the course of the trial, and produce evidence of that fact. [*Graves v. United States, supra*, 150 U.S. at 121, 14 S.Ct. at 41.]

Since the prerequisite of an ability to elucidate the transaction was absent, it was error to authorize a missing witness argument, or give the instruction, as to Golden. It is thus unnecessary to consider his alleged peculiar availability to appellant.

The case turned solely on whether appellant had been authorized by Blackford to use the car. The testimony on this point came predominately from Blackford and Thomas themselves. Accordingly, their relative credibility was of paramount importance. The subject matter of the missing witness inference—that appellant had lied about whether the arresting officer pulled his gun—went directly to credibility. Under these circumstances, it is impossible for us to say that the inference did not substan-

tially sway the judgment. *See Kotteakos v. United States, supra; Simmons v. United States, supra; Coombs v. United States, supra; Hayes v. United States, supra.*[5]

This and other recent cases illustrate that missing witness inferences are being sought, and are often permitted, in a much broader class of circumstances than the doctrine was ever meant to reach. This has occasioned numerous reversals and thus led to retrials that could easily have been avoided. *See Simmons v. United States, supra; Dyson v. United States*, D.C.App., 418 A.2d 127 (1980); *Dent v. United States, supra; Coombs v. United States, supra; Givens v. United States, supra.* The upshot is that both the court's and the parties' time and resources are expended unnecessarily. A more restrained and cautious use of the doctrine would not only be truer to its underlying rationale, but would decrease the unnecessary burden on the judicial system that results from its abuse.

*Reversed.*

---

4. Once the trial had begun, it was too late to expect appellant to locate and produce the missing witness. *Cf. Brown v. United States*, D.C.App., 388 A.2d 451 (1978). In *Brown*, the trial court had concluded that the missing witness was not peculiarly available to the government since he could have been subpoenaed by the defense. We rejected that rationale on appeal because the identity and location of the potential witness only became known to the defense at trial, and thus the defense could not reasonably have been expected to procure him. However, the conviction was affirmed due to the failure to show either an ability to elucidate the transaction, or prejudice from the inference.

5. Having found reversible error as to Golden, it is unnecessary to discuss the missing witness inference as to Tyler at length. Its foundation is considerably stronger than that underlying the inference as to Golden. It is apparent from appellant's testimony that Tyler could have lent considerable support to the contention that appellant had rightful possession of the car while performing work for the owner, even if he could not testify as to the ultimate issue of consent. He would have directly contradicted Blackford's claim that he had never met appellant or Tyler. Tyler lived directly behind appellant's house, and was apparently on good terms with him. In contrast, Blackford denied even knowing him.