John S. TYER, Appellant

v.

UNITED STATES, Appellee.

No. 01–CF–1419.

District of Columbia Court of Appeals.

Argued Sept. 8, 2005.
Decided Dec. 14, 2006.

Peter H. Meyers, Washington, DC, appointed by the court, for appellant. James Klein, Jaclyn Frankfurt, and Andrew G. Ferguson, Public Defender Service, were

on the brief for appellant. Peter H. Meyers filed a supplemental brief for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Thomas J. Tourish, Jr., and Elizabeth Trosman, Assistant United States Attorneys, were on the brief and supplemental brief, for appellee.

Before GLICKMAN, Associate Judge, and NEWMAN and TERRY, Senior Judges.*

TERRY, Senior Judge:

Appellant was charged in a three-count indictment with first-degree premeditated murder, first-degree felony murder, and arson, all arising from the death of Cynthia Evans during a fire. A jury found him guilty of second-degree murder, a lesser included offense of first-degree premeditated murder.[1] Appellant challenges his conviction on several grounds. He contends that the trial court erred by (1) denying his request for a subpoena for the school records of a government witness; (2) refusing to impose discovery sanctions on the government or to give a missing evidence instruction; (3) admitting the prior statements of a government witness on redirect examination; and (4) denying his motion for new trial.[2] We reject all of these contentions and affirm the judgment.

## I

### A. *The Government's Evidence*

Appellant lived with his sister, Mary Tyer, and his sister's children, Angela Miller, Deborah Forte, and Valorize Forte, in a house in Northeast Washington. Cynthia Evans, the wife of appellant's nephew, and Reynard Edwards, not related to any of the other occupants, also stayed there from time to time for indefinite periods.

In the early morning hours of March 5, 2000, shortly after midnight, Angela Miller was visited by her friend, identified only as "Mona," who entrusted Ms. Miller with holding twenty-five dollars. Later that day, when Mona asked Ms. Miller for her money, they discovered that twenty dollars was missing. Mona recalled that after handing the money to Miller, she (Mona) had sent Cynthia Evans into Ms. Miller's bedroom to ask her if she knew a certain phone number. Then "Miss Frances," the godmother of Miller's nephew, told Ms. Miller that she had seen Ms. Evans spend the missing money. Later, Miller and Evans argued in the kitchen, and in the course of that argument Evans shoved

---

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. The jury could not reach a verdict on the arson and felony murder counts, and as to them the court declared a mistrial.

2. A few days after trial, the government's principal witness, Reynard Edwards, recanted his testimony in a signed statement. Appellant promptly filed a motion for new trial under Super. Ct. Crim. R. 33, based in large part on this recantation. Shortly after sentencing, the court denied the motion without a hearing in a thorough and detailed 26–page order.

Appellant also filed a separate post-trial motion for judgment of acquittal, *see* Super. Ct. Crim. R. 29(c), based in part on the alleged incompetence of Mr. Edwards to testify. There is no separate order or docket entry in the record reflecting a ruling on this motion, but from the fact that appellant was sentenced to a lengthy term of imprisonment, we conclude that the court denied the motion by implication.

Miller at least once. Appellant witnessed their altercation.

Ms. Evans eventually went upstairs to lie down for a few minutes. Deborah Forte and Marvin Carter, Mary Tyer's son, arrived home shortly thereafter, and Mary Tyer told them about the argument. Appellant overheard this conversation as well. Ms. Miller and Mr. Carter then left to go to the store, and appellant, who enjoyed a "real close" relationship with Ms. Miller, his niece, went upstairs to talk to Ms. Evans for approximately five to ten minutes.

While appellant was still upstairs, Mary Tyer asked Mr. Edwards to go up and "see what was going on." Edwards found appellant in Ms. Evans' bedroom, questioning her about the missing money. According to Edwards, appellant slapped Ms. Evans across the face and then cut the electrical cord from the television set with a razor blade. She struggled and tried to resist, but appellant wrapped the cord around her neck. Because appellant "asked [him] to," Edwards sprayed "chemicals" from a "clear bottle" next to the television set onto a pile of clothes. He did not know what was in the bottle.

Mr. Edwards then went back downstairs to watch television, and appellant joined him a few minutes later. Soon thereafter Mr. Carter and Ms. Miller returned from their errand, and Mary Tyer, who smelled something burning, asked them to check upstairs. At about the same time, Ms. Evans, still in her bedroom, began screaming for help. Deborah Forte and Reynard Edwards ran upstairs, but Evans' bedroom door was locked. Edwards kicked at the door, but it would not open. He and Ms. Forte then went back downstairs, passing Carter and appellant (who was carrying a

bucket of water upstairs) on the stairway. Deterred by the heat and smoke, they also rushed downstairs. Everyone but Ms. Evans managed to get out of the house.

Ms. Evans was found dead in her bedroom by members of the Fire Department. An autopsy showed that she died of smoke inhalation and also noted that she had suffered burns which, apart from the smoke, were sufficient to kill her. An electrical cord with "a plug at one end" was wrapped around her neck, but her body showed no injuries from the cord. A Fire Department inspector determined that the fire was deliberately set and that an accelerant had been used. Dr. Marie–Lydie Pierre–Louis, the deputy medical examiner, determined that the death was a homicide.

### B. *The Defense Evidence*

Eugene Sober, a fire investigation expert, testified that the fire started on Ms. Evans' bed but that its cause could not be determined. He also doubted that any accelerant spray fueled the fire. On cross-examination, however, Mr. Sober conceded that he did not visit the scene, nor did he interview any of the persons who were in the house during the fire or prepare any written reports based on his analysis.

Marvin Carter testified that as the family members raced upstairs when they heard Ms. Evans' screams, Reynard Edwards exclaimed that Evans had set fire to the room.[3]

The autopsy report revealed that Ms. Evans had ingested cocaine a few hours before her death and that there was cocaine residue in her blood. In addition, both the testimony of witnesses and a toxicology report established that she had

---

**3.** Carter had previously testified, during the government's case, that two days after the fire appellant had told him that either he (appellant) or Edwards would be charged with starting the fire.

been drinking and was severely intoxicated at the time of the fire. She also had been smoking cigarettes in her room that night.

Defense counsel inquired about the circumstances surrounding the police interrogation of Mr. Edwards, the government's star witness. Immediately after the fire, Mr. Edwards signed a statement that did not implicate appellant. He was then questioned by several detectives who accused him of homicide. After four hours of questioning, they took a second statement from him. Mr. Edwards, who acknowledged that he "can read a little bit but not that much," was working on this second statement when the detectives interrupted to question him further. After about three hours of additional interrogation, the police attempted to secure a statement from Mr. Edwards for the third time. At no time did the police read him his *Miranda* rights.[4]

Appellant did not testify.

## II

Defense counsel filed a pre-trial motion requesting a subpoena for certain school records related to Mr. Edwards' mental health, which the court denied. Appellant now contends that this denial was reversible error.

 A trial court's determination of a party's request for a subpoena is reviewed for abuse of discretion. *Cooper v. United States,* 353 A.2d 696, 702 (D.C.1976). To obtain a subpoena *duces tecum* for documents,

> a party must show (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable ... by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production ... and (4)

that the application is made in good faith and is not intended as a "fishing expedition."

*Brown v. United States,* 567 A.2d 426, 428 (D.C.1989); *see Turner v. United States,* 443 A.2d 542, 547–548 (D.C.1982). Furthermore, "[e]vidence regarding mental illness is relevant only when it may reasonably cast doubt on the ability or willingness of a witness to tell the truth." *United States v. Smith,* 316 U.S.App. D.C. 199, 204, 77 F.3d 511, 516 (1996). Finally, a trial court ruling regarding the competency of a witness "should not be disturbed unless the record provides unmistakable evidence that the trial court's impressions are defective." *Hammon v. United States,* 695 A.2d 97, 104 (D.C. 1997).

Appellant maintains that the trial court abused its discretion by denying his subpoena request. Mr. Edwards, who was 38 years old at the time of trial in 2001, had attended the Kennedy Institute, a school for students with learning disabilities, from 1976 to 1982. The trial court, noting that nearly twenty years had passed, denied the motion for a subpoena, but agreed to defense counsel's request for a competency examination of Mr. Edwards at the next hearing. Two days later, however, after the case had been transferred to a different judge for trial, counsel withdrew his request, stating that "at this point we would object to the competency examination." The next day defense counsel reiterated his concerns about Edwards' competency as a witness, but the court stated that his argument "sound[ed] like a fishing expedition." In an abundance of caution, the court agreed to review Mr. Edwards' grand jury testimony and statements to the police to see if there was any reason to doubt his competency.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ At trial the defense did not attempt to establish that Mr. Edwards was incompetent to testify. In his appellate brief, however, appellant claims that Mr. Edwards suffered from a "developmental disability" that was "likely to continue indefinitely," thereby making his school records relevant to a competency determination. But appellant's undocumented speculation about the "common understanding" that schools "like" the Kennedy Institute require "competency-like exams" of their students does not support his assertion that Mr. Edwards suffered from a disability, nor does it meet the minimal relevancy requirement for the issuance of a subpoena. Appellant does not even suggest that Mr. Edwards' former school ever undertook an evaluation of his mental health. It is precisely the vague and conclusory nature of his claim that makes it impossible for us to view appellant's subpoena request as anything more than a fishing expedition.

■ Most significantly, two days after defense counsel requested the court to undertake a competency examination of Mr. Edwards—which would have permitted the court to address any concerns about Edwards' ability to testify—counsel withdrew his request.[5] Given this withdrawal, appellant cannot now claim that he was hindered from "properly preparing for trial without such production." We find nothing in the record to suggest that the evidence sought through the subpoena would have been relevant to the case against appellant, and we hold that the trial court's offer to conduct a competency evaluation "satisfied whatever obligation there may have been to investigate" Mr. Edwards'

competency. *See Hammon,* 695 A.2d at 105.

■ It is significant, as the trial court pointed out, that the requested records from the Kennedy Institute related to a time almost twenty years before the trial (eighteen years before the date of the events about which Mr. Edwards testified). While it is "reasonable" for a jury to be "informed of a witness's mental incapacity *at a time about which he proposes to testify,*" *United States v. Partin,* 493 F.2d 750, 762 (5th Cir.1974) (emphasis added), the temporal gap between Mr. Edwards' school years and the events surrounding Ms. Evans' death is simply too great—at least without some showing of any ongoing mental disability, which appellant has not made—to support appellant's claim that the school records were essential to his defense. *See Velasquez v. United States,* 801 A.2d 72, 79 (D.C.2002) (citing *Partin*), *cert. denied,* 537 U.S. 963, 123 S.Ct. 396, 154 L.Ed.2d 319 (2002); *cf. Robinson v. United States,* 642 A.2d 1306, 1310 (D.C. 1994) (holding that trial court did not err in refusing to admit evidence that complaining witness was a habitual drinker six years before the date of the offense about which she testified).

Finally, the jury had full opportunity to observe Mr. Edwards and his demeanor when he testified. Edwards himself in his testimony described the Kennedy Institute as a school for persons who are "mentally retarded, mentally disturbed, slow learner[s]," and that he became a student there because he "couldn't keep up with the rest of the people in D.C. school." He also

---

**5.** Nor did defense counsel, even after Mr. Edwards had testified, ask the court to reconsider its earlier ruling, although the court expressed a willingness at that time to entertain a renewed competency motion. Consequently, as the government properly points out, this claim on appeal is barred because appellant took a contrary position at trial. *See, e.g., Butts v. United States,* 822 A.2d 407, 416 (D.C.2003) ("This Court has repeatedly held that 'a defendant may not take one position at trial and a contradictory position on appeal.'") (quoting *Brown v. United States,* 627 A.2d 499, 508 (D.C.1993)).

said, however, that he had completed the sixth grade at a different school. Edwards' testimony about the events of March 5 was clear and straightforward, not noticeably different from that of most witnesses in most trials. His account of those events did not give any indication, either in its content or in the manner of its telling, that he was in any way mentally impaired so as to require the jury to discredit what he had to say. In addition, the jury heard defense counsel's theory in closing argument—that Mr. Edwards, a "mentally retarded illiterate man," was "terrorized" by the police and "charmed" by the prosecutor, and that they colluded to "feed[ ] him the facts of the case" and "create memories for him." Counsel thus had ample opportunity to alert the jury to any "red flags" that could have materially called into question the competency of Mr. Edwards, *see United States v. Crosby,* 149 U.S.App. D.C. 306, 308, 462 F.2d 1201, 1203 (1972), but the jury apparently found his testimony credible and returned a guilty verdict.

On this record, we have no reason to second-guess the trial court's determination that Edwards was fit to recall the fire and the events of March 5. We find no abuse of discretion in the denial of the subpoena request, given the lack of any "unmistakable evidence" that the court's assessment of his ability to testify was "defective." *See Hammon,* 695 A.2d at 104.

### III

■ Appellant argues that certain testimony by Mr. Edwards violated his Con-

frontation Clause rights as outlined in *Mercer v. United States,* 724 A.2d 1176 (D.C.1999), and that the admission of prior statements on which that testimony was based violated D.C.Code § 14–102 (2001). Specifically, appellant challenges the admission of Edwards' second written statement to the police and excerpts from Edwards' grand jury testimony during the government's redirect examination. We agree that the admission of these exhibits into evidence violated *Mercer* in one respect, but we are satisfied that their admission was harmless under all the circumstances. We also conclude that appellant was not otherwise denied his rights under the Confrontation Clause of the Sixth Amendment or any other evidentiary rules.[6]

■ D.C.Code § 14–102(b) provides:

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury . . . or (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.

Furthermore, "[w]hen a witness testifies under oath and adopts a statement not made under oath, that prior statement becomes substantive evidence." *Mercer,* 724 A.2d at 1195.

---

6. The government argues that this claim of error was not preserved, since counsel never specifically requested permission to recross-examine Mr. Edwards. We agree with the government that the trial court cannot be faulted for denying a request that was never made. However, appellant did file a written motion during trial, after the exhibits were introduced, asking the court to reconsider their admissibility and to strike the corresponding portions of Mr. Edwards' testimony. We regard this motion as sufficient to preserve the issue for appellate review.

■ The Confrontation Clause entitles a defendant to cross-examine a witness about that witness' testimonial statements, including "testimony ... before a grand jury ... and [statements made during] police interrogations," which are admitted into evidence at trial. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Unless it is harmless beyond a reasonable doubt, *see Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), a Confrontation Clause violation will usually require reversal.

At trial, during his direct examination, Mr. Edwards expressed uncertainty about appellant's precise words and tone of voice on the night of the fire. Seeking to dispel the uncertainty, the prosecutor questioned Mr. Edwards about his grand jury testimony in which he stated that (1) appellant "asked [Ms. Evans why she] took the money from [his] niece," and (2) appellant and Ms. Evans were arguing in a loud tone of voice. Later in his direct testimony, Edwards recounted in detail the altercation between appellant and Ms. Evans, and he also described his own role in the events that unfolded that night. But Mr. Edwards' first written statement to the police after the fire omitted a critical piece of information: the fact that appellant had been upstairs and wrapped an electrical cord around Ms. Evans' throat. Edwards testified that he withheld this information because he was afraid of getting someone (appellant or even himself) in trouble. The police had not extended any assurances that he would not be charged. They continued interrogating him for a while and later obtained a second written statement, which is the focus of this claim on appeal.

On cross-examination, defense counsel questioned Mr. Edwards about both statements. Counsel established that the officers—"two, three, four detectives coming at you"—interrupted the drafting of the first statement to tell Edwards that they did not believe him and that they thought he "had done something." Counsel also established that the police doubted Edwards' first statement when they came to suspect (after learning about the electrical cord) that Ms. Evans' death might be a homicide. To bolster the defense theory that the government had pressured Mr. Edwards into incriminating appellant, defense counsel cross-examined him about his second police statement and grand jury testimony, suggesting that both were shaped by improper government influence. This led to testimony about the officers' purportedly disclosing incriminating facts to Edwards during their interrogation, not advising him of his *Miranda* rights, and taking the signed second statement even though they knew that Edwards was mostly unable to read. Mr. Edwards testified that before taking his second statement, the police told him that the cord "looked like it had been cut" and that they believed there had been "flammable liquids" in the decedent's bedroom. Edwards also agreed with counsel's suggestion that the prosecutor "helped him remember things" about the fire and that he and the prosecutor met on more than five occasions prior to trial. Counsel then read, from the second statement, the following exchange between the police and Edwards:

Q. What was [the victim] doing when [appellant] wrapped the cord around her neck?

A. She was just laying there.

Further responses during cross-examination (*e.g.,* "I ain't sure") indicated that Mr. Edwards did not really comprehend the substance of this portion of his written statement. Counsel suggested that Edwards was uncertain only because he had never read the statement.

Defense counsel also highlighted the disparities between Mr. Edwards' second statement and his grand jury testimony.[7] Counsel emphasized that Edwards told the grand jury (in conflict with his second statement) that he sprayed chemicals in Ms. Evans' bedroom "just twice" (rather than "just on the clothes"), and that appellant hit Ms. Evans "a couple of times" (rather than with "just a slap"). In the latter instance, counsel purported to summarize Edwards' answer to a police question in his second statement, but what counsel actually summarized was only part of Edwards' description of events. Counsel was also able to get Edwards to agree that the first statement, which did not implicate appellant, was the most truthful version of what had happened that night.

On redirect examination, under questioning by the prosecutor, Mr. Edwards again changed his testimony by agreeing that the second statement was true, attributing the omissions in his first statement to fear; at the time, he said, he felt "nervous and scared" and did not "want to see nobody go to jail and get hurt" because they were "all friends." The prosecutor then read to the jury Mr. Edwards' entire answer from the second statement which defense counsel had only summarized earlier. Next, the prosecutor quoted portions of the grand jury transcript to establish that, contrary to defense counsel's claims, Edwards had in fact been advised of his rights. At one point, over defense counsel's objections (only on grounds of "relevance" and "outside the scope"), the court permitted the prosecutor to establish that

Mr. Edwards had adopted the second statement during his grand jury testimony. After the prosecutor completed his redirect, defense counsel did not ask for permission to recross-examine the witness.

### A. D.C.Code § 14–102

Both the second statement and the grand jury testimony were admissible under D.C.Code § 14–102. The declarant, Mr. Edwards, testified at trial, and defense counsel had an opportunity to cross-examine him extensively about both prior statements, as the statute requires (when it says "is subject to cross-examination concerning the statement"). Counsel availed himself of that opportunity. Appellant claims in his brief that "[a]t no point had the defense referenced or mentioned any of the information in the grand jury statement admitted into evidence." He also states that Edwards' allegation that appellant "pushed" Ms. Evans down on the bed was initially introduced by the government on redirect. Our review of the transcript reveals, however, that these details were first brought out by defense counsel during cross-examination of Mr. Edwards about both his second statement and his grand jury testimony.[8]

Most importantly, defense counsel never specifically requested an opportunity to recross-examine Mr. Edwards at trial. Counsel did not register any objection to the admission of the two documents until a few days later, in his written motion for reconsideration of the admissibility of gov-

---

**7.** The trial transcript shows that redacted portions of the grand jury testimony were admitted into evidence as government exhibits. The actual text of Edwards' testimony before the grand jury, however, is not in the record on appeal, though portions of it were read aloud by counsel while Mr. Edwards was on the stand. Our quotations from that testimo-

ny are taken from the briefs of the parties. No one disputes their accuracy.

**8.** For example, counsel read aloud several sentences from the second statement, including "And then [appellant] pushed her down on the bed," and then asked, "That's what your answer was to the police?" Edwards replied, "Yes."

ernment exhibits 31 through 34.[9] In the motion, counsel argued for the first time that both exhibits 33 and 34 ("Edwards exhibits") were barred by D.C.Code § 14–102. The motion asked the court to strike portions of Edwards' testimony, but, even then, counsel did not seek an opportunity to recross-examine the witness.

The admission of both Edwards exhibits satisfies section 14–102(b)(1). In his grand jury testimony Edwards adopted his second statement to the police, which, as appellant concedes, conflicted with his testimony on cross-examination at trial. Because the grand jury testimony was "given under oath," and because Mr. Edwards was "subject to cross-examination" about what he said before the grand jury, it was admissible both for impeachment purposes and as substantive evidence. *See Mercer*, 724 A.2d at 1195.

Both statements also meet the requirements of section 14–102(b)(2). They were "consistent with" Mr. Edwards' direct testimony and were "offered to rebut" the defense assertion that the government had exercised "improper influence" over him. Defense counsel in his cross-examination painted a picture in which Edwards was cajoled and pressured into telling a story that implicated appellant in the second statement, thereby suggesting that the first statement contained the truthful version of events. Counsel's questions implied two principal sources of improper influence: police efforts to pressure Edwards into making the second statement and the prosecutor's efforts to charm and

befriend Edwards over the course of several meetings. We note, however, that the two statements to the police, though separated by a few hours, were both made within approximately twenty-four hours after the fire, long before Edwards had any contact with the prosecutor—and thus long before the prosecutor had an opportunity to exercise any influence at all, proper or improper. *See Tome v. United States*, 513 U.S. 150, 156–160, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (construing FED. R.EVID. 801(d)(1)(B) as consistent with the established common law rule);[10] *People v. Hayes*, 52 Cal.3d 577, 609, 802 P.2d 376, 395, 276 Cal.Rptr. 874, 892 (1990). In addition, Edwards acknowledged in his grand jury testimony that the prosecutor had advised him of his rights and never offered him a deal; on the contrary, the prosecutor told him, when they were both in the grand jury room, that he was "a potential target of this investigation."

Furthermore, a prior consistent statement "may . . . be admitted to rehabilitate a witness . . . 'where the witness has been impeached with a portion of a statement and the rest of the statement contains relevant information that could be used to meet the force of the impeachment. . . .'" *Jacobs v. United States*, 861 A.2d 15, 18–19 (D.C.2004) (citation omitted); *see Musgrove v. United States*, 441 A.2d 980, 985 (D.C.1982). Near the end of his cross-examination, defense counsel confronted Edwards with only a partial summary of his second statement ("I'm going to spare you the entire answer"). His

---

**9.** Exhibits 31, 32, 33, and 34 were, respectively, *portions of the grand jury testimony of* Deborah Forte, Marvin Carter, and Reynard Edwards, and Mr. Edwards' second written statement to the police.

**10.** "The prevailing common-law rule for more than a century before adoption of the Federal Rules of Evidence was that a prior consistent

statement introduced to rebut a charge of recent fabrication or improper influence or motive was *admissible if the statement had been made before the alleged fabrication, influence, or motive came into being,* but it was inadmissible if made afterwards." *Tome*, 513 U.S. at 156, 115 S.Ct. 696 (emphasis added).

selective reading of Edwards' prior statement underscored the discrepancy between Edwards' initial statement and his later statements and testimony. The government, however, was able to "meet the force of the impeachment" by disclosing to the jury the broader content of the challenged statements. *Jacobs*, 861 A.2d at 18–19. The same permissible rehabilitative purpose was evident in the government's line of questioning about Edwards' contacts with the prosecutor, based on Edwards' grand jury testimony.

### B. *Confrontation Clause*

 Appellant claims that the court's refusal to allow recross-examination deprived him of an opportunity to confront Mr. Edwards about his prior statements.[11] He contends that his Confrontation Clause rights were further violated "because the material that the government elicited on redirect was 'new material,' necessitating cross-examination whether or not it was hearsay." If material new facts are elicited on redirect, "the Sixth Amendment mandates that the opposing party must be given the right of recross-examination *on the new issues* ...." *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C.1978) (emphasis added); *see Hilton v. United States*, 435 A.2d 383, 389 (D.C.1981).[12] However, appellant exaggerates when he asserts in his brief that the government's redirect examination "reach[ed] far beyond the scope of the cross-examination." We have held that

there is no general constitutional right to recross-examine a witness, since the scope of the redirect examination is limited to matters which were initially raised on cross-examination, to which the opposing party is merely responding on redirect. Therefore, the extent of recross-examination is discretionary and may be strictly limited by the trial court.

*Hilton*, 435 A.2d at 389 (citation omitted). Appellant raises this claim now despite a cross-examination in which his trial counsel emphasized that Edwards met with the prosecutor "at least five times" to discuss "the details of what happened" during the fire, and that Edwards was "scared" because "two, three, four detectives were coming at [him]" during the investigation. Our reading of the transcript shows that the government did not raise any new issues, but merely expanded on issues already raised prior to redirect examination.

 Furthermore, even if we assume *arguendo* that the trial court erred in denying appellant's request to recross-examine Mr. Edwards, the error was harmless under either *Kotteakos*[13] or *Chapman* (we need not decide which). This court has stated:

[T]he prejudice from wrongly admitted prior consistent statements is that the witness' credibility is unfairly bolstered. But ... it is not unreasonable to assume that juries can be made to see this point and—aided by counsel's argument—tend to discount the weight of statements wrongly introduced. According-

---

11. As we mentioned earlier, defense counsel at trial never actually requested permission to recross-examine Mr. Edwards. At oral argument counsel for appellant asserted that the mid-trial motion for reconsideration of the statements' admissibility put the court on notice that the defense was in fact seeking such permission. We do not read the motion so broadly as to encompass such a request, even implicitly. Nevertheless, as we have said, *su-*

*pra* note 6, we think the motion was sufficient to preserve the issue for appellate review.

12. To be clear, our case law turns on the presence of new "issues," *see Hilton*, 435 A.2d at 389, not just new "material."

13. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

ly, we have twice suggested that "the harm that may occur even if the jury should credit prior consistent statements is less serious than the inadmissible introduction of clearly prejudicial evidence." ... And only in a case where the government's proof of guilt was "marginal" have we thought the prejudice from this impermissible bolstering enough to warrant reversal without more.

*Daye v. United States,* 733 A.2d 321, 327 (D.C.1999) (citations and footnote omitted); *see Porter v. United States,* 826 A.2d 398, 410 (D.C.2003). Despite appellant's assertions to the contrary, the jury must have been aware from counsel's argument that the defense considered Edwards' first police statement to be truthful and all other statements and testimony to be unreliable. At trial, "nothing kept the defense from arguing to the jury that everything that [Edwards] had said—in court and out— was tainted" for any one of various reasons. *See Daye,* 733 A.2d at 327 n. 5. Although appellant argues that the admitted statements "essentially replaced ... live testimony," we think it is more accurate to say that the statements merely helped to clarify Edwards' direct testimony. This is not a "marginal" case meriting reversal. *Id.* at 327. A reasonable factfinder could find the government's proof of guilt here—which included a cord wrapped around the victim's throat and findings by the Fire Department that an arson and homicide occurred—compelling.

Next, appellant argued in his written motion filed during trial, and argues again on appeal, that Edwards "was not properly confronted with his second [police statement] on redirect examination" as required by our decision in *Mercer.* We agree that the procedure outlined in *Mercer* was not followed, and to that extent the trial court erred; however, we conclude that the error was harmless.

In *Mercer* we held that extrinsic evidence offered to prove a prior statement by a witness may be introduced only "while [the witness is] still on the witness stand" and therefore has "the opportunity to explain" the prior statement. 724 A.2d at 1196. In this case the government did not follow that procedure. It did not move to introduce Edwards' grand jury testimony (exhibit 34) until the end of the day on which it finished presenting Edwards' testimony (June 14), after he had left the stand. In a similar manner, Edwards' second police statement (exhibit 33) was not introduced until the close of the government's case in chief a few days later (June 18). However, absent a specific request by defense counsel to pursue recross-examination, we cannot speculate on whether any precluded line of questioning would have diminished the impact of Edwards' testimony. Moreover, we disagree with appellant's contention that the government's transgression resulted in "new" issues coming before the jury. The exhibits at issue do not offer details significantly different from those contained in Edwards first police statement. Furthermore, to the extent that new details surfaced in his testimony, the jury was also exposed to contrary evidence. Without disregarding the fact that a violation of *Mercer* did occur—in that "the manner" in which the exhibits were offered by the government and admitted by the court was erroneous, *id.* at 1196—we are satisfied that the admission of the Edwards exhibits resulted in no meaningful prejudice to the defense, and was therefore harmless error under any standard.

## IV

Appellant contends that the trial court "erred in denying Rule 16 sanctions because it rested its conclusion on the wrong

legal standards" by undertaking an unnecessary "bad faith" or "bad intent" inquiry into the government's failure to preserve the television set. Had the television set been available, appellant maintains, he might possibly have impeached Edwards' testimony if "the cord that's wrapped around the decedent's neck does not match the television" or if the television set still had an intact cord attached to it. For this reason, counsel asked the court in a pretrial hearing to "exclude all testimony regarding the cord" or, alternatively, to give a missing evidence instruction to the jury. The court did not address the request to "exclude all testimony" about the cord, but it did deny the request for an instruction. Appellant now challenges that ruling.

■ We review the denial of a request for a missing evidence instruction for abuse of discretion. *See Nixon v. United States,* 730 A.2d 145, 154 (D.C. 1999); *Reyes–Contreras v. United States,* 719 A.2d 503, 508 (D.C.1998). If we find an erroneous exercise of discretion, *see generally Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979), we review the error for harmlessness. *Holiday v. United States,* 683 A.2d 61, 85 (D.C.1996); *Hinnant v. United States,* 520 A.2d 292, 295 (D.C.1987). The party seeking a missing evidence instruction must make a twofold showing. First, the evidence "must be likely to elucidate the transaction at issue"; second, it "must be peculiarly available to the party against whom the adverse inference is sought to be drawn." *Id.* at 294. Moreover, we have "recognized several dangers inherent in the use of a missing [evidence] instruction," *Dent v. United States,* 404 A.2d 165, 171 (D.C.1979), since it "represents a radical departure" from the principle that the jury should decide the case by evaluating the evidence before it. *See Thomas v. United States,* 447 A.2d 52, 58 (D.C.1982). The trial court therefore has considerable discretion in considering "the degree of negligence or bad faith involved" in the failure to preserve evidence. *Battocchi v. Washington Hospital Center,* 581 A.2d 759, 767 (D.C.1990) (civil case discussing standard for granting missing evidence instruction in criminal cases).

■ Super. Ct.Crim. R. 16(a)(1)(C) provides that, upon request by the defendant in a criminal case,

> the prosecutor shall permit the defendant to inspect and copy or photograph ... tangible objects ... or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense, or are intended for use by the government as evidence in chief at the trial....

The "threshold showing of materiality," however, "is not a high one"; the defendant need only establish a "reasonable indication" that "the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence." *United States v. Curtis,* 755 A.2d 1011, 1014 (D.C.2000) (citations omitted).

Appellant overreaches when he claims that the government, in violation of Rule 16, did not permit him to inspect the television set. Defense counsel acknowledged visiting the crime scene with a defense investigator within two weeks after the fire, but at the time he "had no idea where [the] cord came from." Counsel did not become aware of the television set's relevance until months later, when it was no longer at the crime scene. Before the trial court, counsel asserted that the government's allegation that appellant cut the cord from the television set "did not become apparent until months after" his in-

spection of the house where the fire occurred. The court noted, however, that the government had not discarded or removed the television set from the scene and dismissed the argument that the government had acted with "nefarious purposes." At a pre-trial hearing, defense counsel did not register any objections, seek any other sanctions, or ask the court to consider his unaddressed request to exclude testimony related to the electrical cord. Several days later the court held another hearing at which it reaffirmed its earlier ruling, emphasizing that the defense could cross-examine the police officers at trial about the television set, but declining to give an instruction permitting a jury to infer that the television set was exculpatory.[14]

■■■■ To determine "whether the government's failure to preserve the evidence was error, this court should consider '(1) the circumstances occasioning the loss; (2) systemic steps taken toward preservation; and (3) the magnitude of demonstrated evidentiary materiality.'" *Allen v. United States,* 649 A.2d 548, 553 (D.C. 1994) (citation omitted). The trial court has broad discretion in ruling on any discovery request under Rule 16, and we review its Rule 16 decisions solely for

abuse of discretion. Moreover, "the range of available sanctions [for a Rule 16 violation] is extremely broad, the only real limitation being that a sanction must be 'just under the circumstances.'" *Davis v. United States,* 623 A.2d 601, 605 (D.C. 1993) (citation omitted). Having reviewed the record in light of these principles, we are satisfied that the limited sanction chosen by the trial court—namely, the right to cross-examine the police officers about the missing television set—was appropriate under the circumstances, and that the court did not abuse its discretion in rejecting the defense request for a missing evidence instruction.[15]

Even if we assume for the sake of argument that there was a Rule 16 violation, appellant's showing was not sufficient to meet the requirements, established in *Hinnant* and other cases, for giving a missing evidence instruction. At the pretrial hearing, the court considered whether the television set would elucidate the transaction by twice questioning "what possible importance" the cord could have and concluding, after listening to appellant's argument, that it was "not convinced how relevant it is." The court also inquired whether the television was peculiarly available to the government, ultimately finding that there was only a "three-day

14. The court explained its decision:

There is a three-day window in which the government had apparently possibly exclusive control in this case. And during that time it would have been very helpful, and it would have been good police work, if they had gone and recovered the items.

But it was only a three-day window. And after that it wasn't available to them [the government] or to anyone else. So while I see this as perhaps sloppy police work, I don't see the bad intent or . . . bad faith that would be required, I think, to impose a sanction. . . .

Now I do stick with my original ruling. You can ask the officers did you recover [the television set], you can ask them where

it is, you can ask them why they didn't recover it. . . . But I will not allow you to go that one step further and make an inference that there was bad faith because they felt that it would have been exculpatory to the defendant. Because there isn't any basis at this point on any of the evidence to conclude that way.

15. We agree with the government that appellant's request for a missing evidence instruction is ultimately based on his claim of a Rule 16 discovery violation. As the government points out in its brief, appellant's request below "emphasized that the remedy he sought for the Rule 16 violation was a missing evidence instruction."

window in which the government had apparently possibly exclusive control," and "after that it wasn't available to them [the government] or to anyone else." *Cf. Thomas,* 447 A.2d at 58 ("if a party has made bona fide reasonable efforts to produce the [evidence] without success, no adverse inference will be permitted").

■ Moreover, the court retains "considerable latitude to refuse to give a missing [evidence] instruction, where it determines from all of the circumstances that the inference of unfavorable [evidentiary value] is not a natural or reasonable one." *Simmons v. United States* 444 A.2d 962, 964 (D.C.1982); *see Dent v. United States,* 404 A.2d 165, 171 (D.C.1979). Thus the court was free to conclude "from all of the circumstances" that there was no bad faith on the part of the police in failing to preserve the television set. *See, e.g., Battocchi,* 581 A.2d at 767 (even when elucidation and peculiar availability requirements are met, trial court "in criminal cases ... [has] discretion to withhold the [missing evidence instruction] from the jury after considering ... the degree of negligence or bad faith involved"). Apparently mindful of this court's long-standing admonition that a missing evidence instruction is a "radical departure" because it "essentially creates evidence from non-evidence," *Thomas,* 447 A.2d at 58, the trial court concluded that it would be unfair to "change[ ] the tone of the evidence" by giving an instruction permitting the jury to infer that the television set, had it been preserved, would be exculpatory. Since the trial court has "considerable latitude" to weigh "all of the circumstances," *Simmons,* 444 A.2d at 964, we hold that the court in this case did not abuse its discretion by determining that the loss of the television set had minimal evidentiary value and finding it sufficient to allow defense counsel to question the officers about their "perhaps sloppy police work."

Finally, the government, both at trial and on appeal, has focused on the fact that the cord, wrapped "two or three times" around the victim's neck, was "cut" at one end by "some type of pliers or snips." Thus the subsidiary issue of whether the severed cord came from the television set in the victim's room—and the impeachment value of the resulting inference—is of minimal significance at best. Defense counsel even preemptively suggested during cross-examination that the police had told Mr. Edwards that the cord was from the television set. Edwards promptly dismissed that suggestion, stating, "They ain't never told me that. They just said that she had the cord around her neck."

For all of these reasons, we find no abuse of discretion, and hence no reversible error, in the court's denial of appellant's request for a missing evidence instruction as a Rule 16 sanction.

## V

Appellant filed a post-verdict motion for new trial based, in part, on Mr. Edwards' recantation of his testimony five days after the trial.[16] He now argues that the trial court erred by denying his request for a new trial because this case involves "truly exceptional circumstances" that affect the "interests of justice."

■ A trial court's denial of a motion for new trial is reviewed for abuse of discretion. We will not reverse if the denial is reasonable and supported by the record. *Herbin v. United States,* 683 A.2d

---

**16.** The motion also raised other issues, but before this court appellant focuses solely on Mr. Edwards' recantation. We therefore treat the other claims raised in the motion as abandoned.

437, 442 (D.C.1996). "If [the] motion for new trial is made within seven days after the verdict, the court may grant the motion 'in the interest of justice.'" *Id.* at 440 (quoting Super. Ct. Crim. R. 33; other citation and footnote omitted). But a new trial will be ordered in the interest of justice only when, after considering the evidence, the court can find that "exceptional circumstances" prevented the defendant from receiving a fair trial. *Huggins v. United States*, 333 A.2d 385, 387 (D.C. 1975). The moving party has the burden of persuasion. *Payne v. United States*, 516 A.2d 484, 500 (D.C.1986). As this court said in another case involving a recantation by a government witness:

> Under the interest of justice standard, the trial court ... is to sit as the "thirteenth juror" to determine "whether a fair trial requires that the [recantation] be made available to the jury." ... Only if the recantation is credible need the court determine the effect that the recantation would have had on the jury.

*Herbin*, 683 A.2d at 440–441 (citations and footnote omitted). Consequently, if the trial court does not deem the recantation credible, that determination ends the inquiry. *Id.* at 441.

■ In its order denying the motion, *supra* note 2, the court weighed the circumstances of Mr. Edwards' recantation and concluded that it was "incredible." The court found that the recantation was made under "intimidating circumstances," when Edwards was approached at a bus stop near his workplace by four members of the defense team (two attorneys and two law clerks). When he agreed to speak with the attorneys about the case, they drove him to another nearby location and began to question him about the events that occurred on the day of the murder.

The court concluded that Mr. Edwards, after saying "that the four individuals were scaring him," began to "recount a story that would please the attorneys...." It was that "story" on which the motion was based. We cannot accept appellant's contention that the trial court erred in basing its credibility finding on the intimidating circumstances under which the recantation was made. As the government points out in its supplemental brief, appellant "can hardly claim that this common-sense inference was an abuse of discretion, given that appellant urged a far more extreme inference upon the jury at trial." [17]

■ Moreover, having also presided over a trial that lasted for several days, the trial judge was uniquely qualified to evaluate Mr. Edwards' performance as a witness and did not need to conduct a hearing before making a credibility determination. *See, e.g., Bell v. United States*, 871 A.2d 1199, 1202 (D.C.2005) ("the judge who presided over the trial ... was well situated to decide the credibility of the recanting [witness] without a hearing"); *Herbin*, 683 A.2d at 442 (same). The judge found that Edwards' responses during his trial testimony were "quite candid and very credible," notwithstanding the cross-examination in which defense counsel questioned Edwards about his prior inconsistent statements and grand jury testimony. The trial transcript shows that, despite Edwards' intermittent wavering, he understood the questions asked of him and answered them coherently. The trial judge also considered the corroborating testimony of other witnesses. Ms. Forte, for example, confirmed the incriminating aspects of Edwards' testimony: that appellant went to the second floor to confront the decedent in her room about some miss-

17. For example, defense counsel in his closing argument characterized Mr. Edwards as a "mentally retarded illiterate man" who was "terrorized" by the police.

ing money, that Mr. Edwards returned to the living room before appellant did, and that the victim's screams were heard shortly thereafter. The recantation did not refute these and other incriminating facts that pointed toward appellant's guilt.

The record before us reveals no "exceptional circumstances" that would warrant a new trial. *Huggins,* 333 A.2d at 387. Appellant's motion was properly denied.

## VI

The judgment of conviction and the denial of appellant's motion for new trial are both

*Affirmed.*