*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 17-CF-685 & 17-CF-800

TERREZ A. CROCKER & ANDRE R. WALKER, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-11893-15 & CF3-11894-15)

(Hon. Ronna L. Beck, Trial Judge)

(Argued February 11, 2020                    Decided July 1, 2021)

*April E. Fearnley* for appellant Terrez A. Crocker.

*James Whitehead*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the brief, for appellant Andre R. Walker.

*Eric Hansford*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Laura Crane*, and *Alicia M. Long*, Assistant United States Attorneys, were on the brief, for appellee United States.

Before GLICKMAN, EASTERLY, and MCLEESE, *Associate Judges*.

GLICKMAN, *Associate Judge*: Appellants Terrez Crocker and Andre Walker

appeal convictions for robbery and other offenses. Mr. Walker contends the trial

court abused its discretion by denying his request for a missing evidence instruction as a sanction for the government's failure to preserve evidence material to his defense. Mr. Crocker joins in that claim. In addition, Mr. Crocker contends the trial court impermissibly curtailed bias cross-examination of a key government witness, and plainly erred by allowing the prosecutor to vouch for the credibility of witnesses in closing argument.[1] Concluding that appellants' claims do not entitle them to relief, we affirm their convictions.

## I.

On the night of August 5, 2015, Thomas Hall left his unlocked white Volkswagen Jetta outside his home in Lothian, Maryland, with the keys still in the ignition. The car was gone the next morning, and Mr. Hall reported it stolen.

---

[1] In his brief on appeal, Mr. Crocker also claimed the trial court erred by denying his motion to suppress data collected by a global positioning system (GPS) ankle monitor he had worn as a condition of his probation in a previous case. Mr. Crocker argued that the police violated his Fourth Amendment rights by obtaining the data from CSOSA, the agency supervising Mr. Crocker's probation, without a search warrant. Subsequently, however, we held in *United States v. Jackson*, 214 A.3d 464 (D.C. 2019), that "CSOSA did not violate [a probationer's] reasonable expectation of privacy by granting the police access to his GPS tracking data in furtherance of their mutual law enforcement objectives" without a search warrant. *Id.* at 486. That holding concededly disposes of Mr. Crocker's Fourth Amendment claim.

A few weeks later, between 6:00 p.m. and 7:20 p.m. on the evening of August 30, the Jetta was involved in three purse snatchings near the Capital Heights Metro Station in Washington, D.C. In each instance, two women reportedly emerged from the back of the Jetta, grabbed for the victim's purse, and returned to the car, which then drove away. In the last encounter in the series, the victim fended off the women, called the police at 7:24 p.m., and provided a partial license plate number to the dispatcher. By 7:47 p.m., the police located the Jetta. It took off, and the police pursued it in a high-speed chase until it crashed. The Jetta's four occupants — Mr. Crocker, the driver; Mr. Walker, the front-seat passenger; and Jessica Robinson and fifteen-year-old A.B., the two backseat passengers — were apprehended as they attempted to flee on foot. The resulting criminal charges against the group included conspiracy to commit robbery, robbery, assault with intent to commit robbery, and fleeing the police. Mr. Crocker was charged, in addition, with unauthorized use of a vehicle during a crime of violence, receiving stolen property, destruction of property, and reckless driving.

Ms. Robinson and A.B. entered guilty pleas and were prosecution witnesses at appellants' trial.[2] Ms. Robinson testified that she and Mr. Walker, who was her

---

[2] Ms. Robinson testified pursuant to a plea agreement with the United States. A.B., who had pleaded guilty to the robberies in juvenile court and been committed

boyfriend, met up with Mr. Crocker on the morning of August 30, 2015, at a Dollar Plus store, where Mr. Crocker tried unsuccessfully to sell an iPad with a cracked screen. Ms. Robinson had met Mr. Crocker on prior occasions and knew him to be Mr. Walker's friend from childhood. After purchasing some cigars and rolling papers for marijuana, Ms. Robinson and Mr. Walker got into the car Mr. Crocker was driving. Mr. Walker sat in the front passenger seat and Ms. Robinson sat in the back seat. In the car, she testified, they smoked marijuana. The two men discussed a plan to meet and rob a particular "guy" in the area, but they were unable to reach this man on the phone to arrange a meeting.[3]

Mr. Crocker then called A.B., whom he referred to as his girlfriend, and drove to her apartment to pick her up. A.B. got into the backseat with Ms. Robinson. A.B. testified she had never met Mr. Walker or Ms. Robinson before that day and did not know their names. She referred to the front-seat passenger at trial as "50," which Ms. Robinson testified was one of Mr. Walker's nicknames.

---

to the custody of the D.C. Department of Youth Rehabilitation Services (DYRS) at a secure residential center called New Beginnings, testified pursuant to a subpoena without any agreement to cooperate.

[3] For this abortive effort, the grand jury charged appellants with attempted robbery. The court acquitted them of that charge at trial.

A.B. and Ms. Robinson testified that the group then drove around together the rest of the afternoon, smoking marijuana and looking for people to rob. The two men pointed out possible targets and encouraged the women to get out and rob them of their purses. A.B. and Ms. Robinson described three stops in which one or both of them committed or attempted to commit a purse snatching at appellants' instigation.[4]

The victims of those three purse snatchings also testified at trial. Each testified that two women exited a white car, accosted her, robbed or attempted to rob her, and then retreated to the car, which immediately drove away. In the first encounter, which occurred at approximately 6:00 p.m., one of the robbers pushed the victim, Ms. R., while the second took her purse, which contained a black Gucci wallet. Ms. R. was unable to identify either perpetrator or the people who remained in the Jetta during the robbery, but she noticed that the front-seat passenger wore a baseball cap.

---

[4] Their accounts differed in various details. Ms. Robinson and A.B. did not always agree as to who did what, and A.B. denied actively participating in the second purse snatching.

In the second incident, the victim, Ms. C., identified Ms. Robinson as the robber who grabbed both her purse and an orange cell phone that fell out of the purse during the snatching.[5]  Ms. C. testified that she saw two men in the front seat of the white car and heard them yelling for the women to hurry up.  She identified the car as a Volkswagen.  She could not identify the two men inside it.

The third victim, Ms. E., identified Ms. Robinson and A.B. as the two women who ran up behind her and tried to take her purse away from her.  Ms. E. fought them off and the two women ran back into a white Volkswagen Jetta that was idling nearby.  Ms. E. could not identify the individuals waiting in the car.  The Jetta drove off, but Ms. E. was able to memorize part of its license plate number and called it in to the police immediately, at 7:24 p.m.  Approximately twenty minutes later, at 7:47 p.m., the police spotted and began to chase the white Jetta.  After it crashed, they arrested its four fleeing occupants — Ms. Robinson, A.B., and appellants.  Inside the car, on the back seat, the police recovered Ms. R.'s black Gucci wallet.  From

---

[5]  A.B. testified that Ms. Robinson gave the cell phone to Mr. Walker, who attempted to turn it on.  Ms. Robinson, however, testified that A.B. gave it to Mr. Crocker, who said he could sell it.

Ms. Robinson's person, they recovered a credit card and an identification card belonging to Ms. C.

The police saw Mr. Walker discard a red baseball cap along with his shirt as he ran from the Jetta, and they recovered both items. In subsequent DNA testing of biological material on the cap, examiners found a match with Mr. Walker's DNA profile.

The police had the wrecked Jetta towed to a lot. Four days later, the police released the Jetta to Mr. Hall, who visited the lot with an insurance agent and took photographs of the vehicle's interior for insurance purposes. The photographs, introduced in evidence at trial by the prosecution, showed an orange cell phone on the front passenger seat. At trial, Ms. C. identified the phone as hers. The photos also showed, among other things, a cracked iPad (which corroborated Ms. Robinson's testimony that Mr. Crocker had been trying to sell such an item when he met her and Mr. Walker earlier in the day), and empty marijuana bags, cigar butts, and ashes (which corroborated the testimony that the group had been smoking marijuana). The police never retrieved the orange cell phone or the other items seen in the photos. Mr. Hall testified that he left the car at the lot and received a payoff for it from his insurance company because the car had been "totaled."

The prosecution also put in evidence data, extracted from Mr. Crocker's GPS ankle monitor, showing his location on the night when Mr. Hall's Jetta was stolen and at the times of the robberies. The data showed that Mr. Crocker was outside Mr. Hall's home at around 12:45 a.m. on August 6, 2015, and that fifteen minutes later he was travelling in that area at approximately twenty-five miles per hour. The GPS records also showed that Mr. Crocker was in the vicinity of each of the charged robberies at the times they were committed on August 30 and that, after the last reported purse snatching, he stopped at Mr. Walker's residence for about ten minutes, from 7:26 to 7:36 p.m.

In their defense at trial, both appellants attacked the credibility of Ms. Robinson and A.B. and denied involvement in their robberies.[6] Mr. Crocker denied knowing what the two women were doing when they left him in the car. Mr. Walker claimed he did not join the group until the Jetta stopped at his residence *after* the last reported robbery already had been committed.[7]

---

[6] Neither appellant testified at trial.

[7] Mr. Walker presented no evidence supporting this assertion. He argued, however, that it was consistent with the GPS data and Ms. Robinson's post-arrest statement to police that the group was going to pick up someone she did not know and drop that person off in Chinatown.

The jury found both appellants guilty of conspiracy to commit robbery, one count of robbery, one count of assault with intent to commit robbery, and fleeing the police.[8] The jury also found Mr. Crocker guilty of three counts of unauthorized use of a vehicle during a crime of violence, receiving stolen property, destruction of property, and reckless driving.[9]

## II.

Appellants argue that the release of the Jetta and its contents to Mr. Hall violated the government's duty under Superior Court Criminal Rule 16 to preserve discoverable evidence for defense inspection, and that the trial judge erred in denying Mr. Walker's request for a missing evidence instruction as a sanction for that violation. We review this ruling for abuse of discretion, "subject to the

---

[8] In violation of D.C. Code §§ 22-1805a(a)(2), -2801 (conspiracy to commit robbery); 22-2801 (robbery); 22-401 (assault with intent to commit robbery); 50-2201.05b(b)(2) (fleeing the police in a motor vehicle). The jury acquitted appellants of the robbery charge relating to the first purse snatching.

[9] In violation of D.C. Code §§ 22-3215(d)(2)(A) (unauthorized use of a vehicle during a crime of violence); 22-3232(a), (c) (receiving stolen property); 22-303 (destruction of property); 50-2201.04 (reckless driving).

qualification that the proper construction of Criminal Rule 16 is a legal question as to which our review is *de novo*."[10]

## A. Additional Background

At appellants' presentment in court on August 31, 2015, Mr. Walker's counsel provided a "discovery and preservation" letter to the Assistant United States Attorney representing the government in the proceeding. The letter recited the government's duty under Rule 16 to preserve material evidence for defense inspection. The letter did not specifically identify the Jetta or its contents as material and subject to preservation, however. Three days later, the police released the Jetta to Mr. Hall.[11] On April 10, 2017 — just before the start of trial — Mr. Walker's counsel informed the trial judge that the defense intended to request a missing evidence instruction as a sanction for the government's failure to preserve the Jetta for defense inspection.

---

[10] *Weems v. United States*, 191 A.3d 296, 300 (D.C. 2018).

[11] Mr. Walker first sought an opportunity to view the Jetta, and any "proceeds" of the robberies left in the car, in January 2016. By then the car was no longer in the government's possession or available for inspection.

Mr. Walker submitted his proposed missing evidence instruction at the conclusion of the trial. The instruction stated that because "the government did not take sufficient steps to preserve" the Jetta or Ms. C.'s cell phone for defense inspection, the jury could "infer that the evidence would have been unfavorable to the government," unless it concluded the evidence was duplicative or "unimportant."[12] The instruction said nothing about *how* the evidence might have been unfavorable to the prosecution. In the colloquy over whether to give this instruction, the judge pressed Mr. Walker's counsel to explain how the missing

_____

[12] In its entirety, the proposed instruction read as follows:

> If evidence relevant to an issue in this case was only within the power of one party to produce, was not produced by that party, and its absence has not been sufficiently explained, then you may, if you deem it appropriate, infer that the evidence would have been unfavorable to the party who failed to produce it. However, you should not draw such an inference from evidence that, in your judgment was equally available to both parties or which would have duplicated other evidence or that you think was unimportant. In this case, the 2006 Volkswagen Jetta was in the possession of the government, and the cell phone identified by [Ms. C.] as belonging to her in Government's Exhibit 82. Both of these items were unavailable to defense counsel and the government did not take sufficient steps to preserve the items or adequately document their condition or contents. Thus, if you find the absence of that evidence not sufficiently explained, you may, if you deem appropriate, infer that the evidence would have been unfavorable to the government.

evidence could have been significant for the defense. "Under your wildest dreams," the judge ultimately inquired, "how would [inspection of the Jetta] have favored your client?" Counsel said in general terms that the car might have contained other evidence that the police failed to find and the photographs did not reveal, such as other stolen items hidden in the glove box or under the front seat. More specifically, counsel cited the conflicting testimony of Ms. Robinson and A.B. regarding whether Mr. Walker handled the orange cell phone,[13] and argued that the defense could have retained experts to "fingerprint[] or swab[] that phone," and to "extract[] the data from that phone," to resolve that conflict. After hearing counsel out, the judge concluded that a missing evidence instruction was not warranted as a sanction. Appellants requested no other sanction for the failure to preserve the Jetta and its contents.[14]

---

[13] *See supra* note 5.

[14] The judge's ruling left defense counsel free to argue the superficiality and sloppiness of the police investigation — as shown by the failure to "fingerprint the car" or even to search the Jetta "well enough" to find the stolen cell phone — as grounds for finding the government had failed to meet its burden of proof beyond a reasonable doubt.

## B. Materiality

In pertinent part, Criminal Rule 16(a)(1)(E) requires the government to "permit the defendant to inspect and to copy or photograph . . . tangible objects . . . if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense."[15] "This Rule 16 duty to permit pretrial discovery entails an antecedent duty to preserve material that the government has obtained and knows or should know is discoverable."[16] Appellants argue the Jetta and its contents were in the government's possession and material to the preparation of their defense, and that the government violated a Rule 16 duty to preserve those items for their inspection by prematurely releasing the vehicle to Mr. Hall. Appellants "bear[] the burden of establishing a prima facie case of materiality."[17]

---

[15] Evidence in the possession of the police is within the government's custody or control for purposes of Rule 16. *Howard v. United States*, 241 A.3d 554, 559 (D.C. 2020).

[16] *Weems*, 191 A.3d at 300–01.

[17] *Watson v. United States*, 43 A.3d 276, 283 (D.C. 2012). Given that we conclude appellants have shouldered their burden in that respect, we need not consider their alternative argument that the Jetta and its contents should have been preserved for defense inspection regardless of their materiality because the government intended to use photographs of them in its case-in-chief at trial. *See* Super. Ct. Crim. R. 16(a)(1)(E)(ii).

The threshold requirement of materiality "is not a high one; the defendant need only establish a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence."[18] The inquiry into "[w]hether evidence is 'material' requires a prospective evaluation, from the point of view of the defendant prior to trial, of whether the evidence has potential value for the defendant's development of a defense."[19] That means the government's duty to preserve evidence rests, not on its own subjective determination that particular evidence *is* or *is not* material, but "on [the government's] *reasonable expectation* that it will fall within the scope of evidence that is discoverable under Rule 16."[20]

---

[18] *Koonce v. District of Columbia*, 111 A.3d 1009, 1013 (D.C. 2015) (quoting *Tyer v. United States*, 912 A.2d 1150, 1164 (D.C. 2006)); *see also Howard*, 241 A.3d at 559–60.

[19] *Watson*, 43 A.3d at 284 (quoting *Wiggins v. United States*, 521 A.2d 1146, 1148 (D.C. 1987)). Thus, the standard of materiality under Rule 16 is not as demanding as the post-trial due process standard of materiality that applies when the government has suppressed evidence favorable to the defense. *See Turner v. United States*, 116 A.3d 894, 913 (D.C. 2015) ("Evidence is material within the meaning of *Brady* 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting *Miller v. United States*, 14 A.3d 1094, 1195 (D.C. 2011)), *aff'd* 137 S. Ct. 1885 (2017)).

[20] *Askew v. United States*, 229 A.3d 1230, 1242 (D.C. 2020) (quoting *Koonce*, 111 A.3d at 1017) (emphasis added in *Askew*).

We conclude that the Jetta and its contents met Rule 16's standard of materiality to the preparation of appellants' defenses, and that from the outset the police and the attorneys handling the case for the government should have expected the car to be discoverable on that basis.  Appellants were accused of using the Jetta in the commission of a string of robberies, and the car contained proceeds from two of those robberies — a wallet taken in the first robbery and a cell phone taken in the second.  That appellants were in the Jetta with Ms. Robinson and A.B. when the police located it shortly *after* the robberies, that appellants fled from the police, and that Mr. Walker discarded his hat and shirt as he fled, constituted circumstantial evidence of their guilt.  However, no victim or eyewitness to any of the robberies identified either appellant as a participant in them or as an occupant of the Jetta at any time on August 30 before the police sighted it.  And the police obtained no forensic evidence linking appellants to the robberies, no proceeds or other incriminating evidence from their persons, and no admissions from them.  In these circumstances, the police and the attorneys for the government reasonably should have expected from the outset that appellants' counsel would want to inspect the Jetta and the recovered proceeds, not merely to ascertain for themselves whether the

evidence was as alleged, but also to look for evidence supporting doubt as to appellants' involvement in the robberies.[21]

There conceivably could have been such evidence. Mr. Walker argues, for example, that a failure to find his fingerprints or DNA inside of the Jetta would have undercut the testimony of Ms. Robinson and A.B. that he spent the entire afternoon in the car with them. This might have bolstered his claim at trial that he was not present during the robberies because he did not join the group in the Jetta until it stopped at his residence after the robberies had been committed. Similarly, perhaps the absence of Mr. Crocker's or Mr. Walker's fingerprints or DNA on the stolen cell phone could have been used to rebut the testimony of Ms. Robinson and A.B. that

---

[21] At some later point prior to trial, it became clear the prosecution's case against appellants would rely on the testimony of Ms. Robinson and A.B., and hence that appellants would be interested in discovering evidence impeaching or contradicting that testimony. If anything, that only confirmed the materiality of the Jetta and its contents to the preparation of appellants' defenses.

one of them handled the phone.[22] "[T]he absence of [physical] evidence is a relevant 'fact' which properly [can be] argued to the jury."[23]

Citing the desirability of returning stolen property to their rightful owners without undue delay, the government posits that the police can satisfy Rule 16 by providing the defendant with "sufficiently informative photographs" of the stolen items in lieu of defense inspection.[24]  In some cases that may be so, but the government has not explained how any photographs taken in this case were "sufficiently informative" to substitute for defense inspection of the Jetta and its contents.  Photographs obviously could not indicate the absence of fingerprints and DNA.

---

[22]  At a pretrial motions hearing in November 2016, Mr. Walker invoked his right under the Innocence Protection Act to request DNA testing on "the proceeds that were recovered from the car, as well as the proceeds that were recovered from . . . Ms. Robinson," because such testing could "show that Mr. Walker never handled or touched those items."  By then, of course, Ms. C.'s cell phone and other items left in the Jetta were no longer available.

[23]  *Greer v. United States*, 697 A.2d 1207, 1210 (D.C. 1997) (alterations in original) (quoting *United States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992)).  Of course, appellants were able to argue the absence of fingerprint and DNA evidence at trial due to the failure of the police to look for it.  Even so, the argument might have seemed stronger if appellants had shown such evidence was not there to be found.

[24]  *See In re Q.D.G.*, 706 A.2d 36, 38 & n.6 (D.C. 1998).

Appellants may be unable to demonstrate exactly what inspection of the car would have revealed, but that does not mean they failed to carry their burden of showing materiality. "We recognize the force of appellant[s'] complaint that it is difficult to proffer the relevance of evidence that [they] cannot view."[25] That is one reason the standard of materiality is not a high bar and requires only a "reasonable indication" that the unpreserved evidence could have been useful to the defense. We hold that appellants have met that standard in the circumstances of this case, and that the government violated its duty to preserve tangible evidence material to the preparation of appellants' defenses by releasing the Jetta and its contents to Mr. Hall.

---

[25] *Howard*, 241 A.3d at 562. Rule 16 disputes arising from the government's failure to preserve discoverable evidence often pose such problems. *See Yoon v. United States*, 594 A.2d 1056, 1063 (D.C. 1991) ("It is impossible to know with certainty what effect the nondisclosure had on appellant's pretrial planning, including the decision whether to seek a negotiated plea. A key purpose of Rule 16 is to avoid the need for such *post hoc* inquiry."), *amended on reh'g in part*, 610 A.2d 1388 (D.C. 1992); *cf. Vaughn v. Rosen*, 484 F.2d 820, 823–24 (D.C. Cir. 1973) ("In a very real sense, only one side to the controversy (the side opposing disclosure) is in a position confidently to make statements categorizing information, and this case provides a classic example of such a situation.").

## C. Sanctions

When a trial court determines that the government violated Rule 16 by failing to preserve discoverable evidence, the court has discretion to choose from among an "extremely broad range of sanctions."[26]  In deciding "what sanction, if any, to impose," the court ordinarily should "weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial[,] in order to come to a determination that will serve the ends of justice."[27]

In this case, however, the only sanction appellants requested in the trial court was a missing evidence instruction.  And on appeal, they argue only that the court

---

[26] *Howard*, 241 A.3d at 560 (quoting *Tann v. United States*, 127 A.3d 400, 489 (D.C. 2015) (internal quotation marks omitted)).

[27] *Weems*, 191 A.3d at 306 (alteration in original) (quoting *Rodriguez v. United States*, 915 A.2d 380, 389 (D.C. 2007)).  As our cases have explained,

> The deliberate destruction of evidence to hinder the defense generally merits severe sanction, and gross negligence leading to the loss of evidence usually calls for meaningful sanction as well.  But a merely negligent or good faith failure to preserve discoverable evidence does not automatically require a trial court to impose a penalty; the court may excuse it and refuse to apply sanctions.

*Id.* (internal quotation marks and citations omitted).

was required to give that instruction as a matter of law.  They do not argue that the trial court plainly erred by failing *sua sponte* to consider and impose an alternative, unrequested sanction.  Accordingly, we confine our discussion to whether appellants were entitled to the specific sanction they sought.[28]  We conclude not, because appellants did not satisfy the preconditions for giving a missing evidence instruction — preconditions this court repeatedly has insisted must be met in cases arising from the government's non-preservation of discoverable evidence in violation of Rule 16.

A missing evidence instruction licenses the jury to infer that lost evidence would be unfavorable to a party that failed to preserve it.  We have identified "several dangers inherent in allowing the jury to draw [that] inference," including that the "inference . . . in effect creates evidence from nonevidence [and] may add a fictitious weight to one side of the case, for example, by giving the missing [evidence] undeserved significance."[29]  This "'represents a radical departure' from the principle that the jury should decide the case by evaluating the evidence before it."[30]  An additional problematic feature of missing evidence instructions,

---

[28] *See Howard*, 241 A.3d at 560 n.4; *Askew*, 229 A.3d at 1246.

[29] *Dent v. United States*, 404 A.2d 165, 170–71 (D.C. 1979).

[30] *Tyer*, 912 A.2d at 1164 (quoting *Thomas v. United States*, 447 A.2d 52, 58 (D.C. 1982)).

exemplified by the one proffered by Mr. Walker in this case, is that they afford little guidance to the jury in determining whether it is reasonable and appropriate to draw the adverse inference or not.

In light of such concerns, we have held that the trial court "retains considerable latitude to refuse to give a missing evidence instruction, where it determines from all of the circumstances that the inference of unfavorable evidentiary value is not a natural or reasonable one."[31] The party requesting a missing evidence instruction therefore "must make a twofold showing": (1) that the lost evidence was "peculiarly available to the party against whom the adverse inference is sought to be drawn"; and (2) that the lost evidence would have been "likely to elucidate the transaction at issue"[32] in a way that justifies drawing the adverse inference against that party. In other words, it must be likely that the missing evidence would have been "important,"[33] and that it could have been unfavorable to

---

[31] *Howard*, 241 A.3d at 561 (quoting *Tyer*, 912 A.2d at 1166).

[32] *Tyer*, 912 A.2d at 1164 (quoting *Hinnant v. United States*, 520 A.2d 292, 294 (D.C. 1987)); *accord Ashby v. United States*, 199 A.3d 634, 647 (D.C. 2019) (quoting *Tyer*, 912 A.2d at 1164); *Medley v. United States*, 104 A.3d 115, 132 (D.C. 2014) (quoting *Tyer*, 912 A.2d at 1164).

[33] *See Howard*, 241 A.3d at 562 (explaining that lost evidence "must have been 'noncumulative' and 'an important part of the case' because '[a]bsent these conditions, the logical basis for the inference evaporates, for nothing can reasonably

the party responsible for its loss (or, equivalently, favorable to the party requesting the instruction).[34]

Applying those tests, we think it clear the trial court did not abuse its discretion in denying Mr. Walker's request for a missing evidence instruction. Although the Jetta was "peculiarly available" to the government (the police having seized and impounded it), appellants failed in the trial court to show the requisite likelihood that inspection of the vehicle could have uncovered evidence unfavorable to the government so as to have "elucidated" the events of August 30. Mr. Walker argued only that examination of Ms. C.'s orange cell phone might have helped resolve whether he personally had handled it, and that more stolen items and other unspecified evidence might have been found inside the Jetta. This was nothing more than speculation; though it sufficed to explain why the government should have appreciated the potential materiality of the car and its contents to defense preparation, it was not enough to show a likelihood that the lost evidence actually

---

be inferred from the failure to [present evidence that] would not be expected to contribute additional pertinent facts to the trial" (quoting *Thomas v. United States*, 447 A.2d 52, 57 (D.C. 1982)).

[34] While missing evidence also might have "elucidated" the matter in dispute if the evidence could have significantly *benefited* the party that lost it, that obviously would not justify instructing the jury it could infer the opposite from the loss.

was important enough to justify a missing evidence instruction.[35]  While the

*presence* of Mr. Walker's fingerprints or DNA on the stolen cell phone, or other

objects in the Jetta, likely would have strengthened the prosecution case, their

*absence* would not have significantly weakened that case or "elucidated" whether

Mr. Walker was present in the Jetta during the robberies.  The mere absence of his

prints and DNA on the cell phone, for example, would not have proved Mr. Walker

never handled it.[36]  Nor would it have undermined the credibility of Ms. Robinson

(who said she gave the phone to Mr. Crocker, not Mr. Walker) or disproved her

testimony that Mr. Walker was present in the Jetta during the robberies and was a

---

[35] *Cf. Howard*, 241 A.3d at 561 ("Assuming, without deciding, that the failure in this case to preserve all the contents of the backpack resulted in a violation of the Rule 16 duty to disclose evidence material to the defense, we discern no abuse of discretion in the trial court's decision to deny the request for a missing evidence instruction," given the court's findings that there was "no bad faith on the government's part" and that "a missing evidence instruction would really overstate the evidence."); *Tyer*, 912 A.2d at 1165 (assuming a Rule 16 violation but affirming denial of missing evidence instruction because inspection of the evidence was unlikely to elucidate the transaction at issue).  We do not rule out the possibility that Mr. Walker might have sought and obtained other meaningful sanctions; in that regard, we note the trial court allowed Mr. Walker to cross-examine government witnesses and argue that their loss of potential evidence provided reason to doubt the sufficiency of the government's case against him. *Cf. id.* (affirming trial court's denial of a missing evidence instruction and "finding it sufficient to allow defense counsel to question the officers about their 'perhaps sloppy police work'").

[36] For a variety of reasons, as the government points out, fingerprints and DNA often are not recoverable from objects that people certainly have handled.  In this case, for example, the police seized Mr. Walker's shirt and Mr. Crocker's cell phone on August 30.  They did not recover appellants' DNA from either item.

co-conspirator and accomplice to them. For similar reasons, it is hardly likely that the retrieval of other items from the Jetta would have been unfavorable to the government's case against appellants. Neither A.B. nor Ms. Robinson claimed that Mr. Walker touched other proceeds of their purse snatchings, nor did they say or the prosecution allege that he ever drove the car himself. Mr. Walker did not even argue in the trial court, let alone show the requisite likelihood, that a thorough search of the Jetta and its contents for his fingerprints and DNA could have established he was not long in the car on the day of the robberies.

There is no allegation, nor reason to suppose, that the police acted in bad faith or had a nefarious motive for releasing the wrecked Jetta and its contents to Mr. Hall. This is important, for the officers' state of mind is "key to determining whether the adverse inference associated with a missing evidence instruction would be 'a natural or reasonable one.'"[37] This is because "if an officer has acted in bad faith in destroying evidence, it is a more natural inference that [the officer] thought the

---

[37] *Howard*, 241 A.3d at 561 (quoting *Tyer*, 912 A.2d at 1166).

evidence would have been harmful to the case against the defendant than if the officer was merely forgetful or negligent."[38]

Mr. Walker argues that the police exhibited, if not bad faith or nefarious motive, then at least "gross indifference to or reckless disregard for the relevance of the evidence"[39] in the Jetta to his criminal prosecution. This, he contends, was culpable enough to require the trial court to instruct the jury that it could infer the lost evidence would have been unfavorable to the prosecution. When the terms "gross indifference" and "reckless disregard" are used in this connection, we understand them to mean more than mere negligence, or even gross negligence, but rather "at least knowing disregard of the importance of the document to an opposing litigant's claim."[40] Such knowledge is tantamount to bad faith. Yet Mr. Walker has not shown even gross negligence here.

---

[38] *Id.*; *see also Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759, 766 (D.C. 1990) ("In essence, the inference is akin to an admission by conduct of the weakness of one's own case.").

[39] *Battocchi*, 581 A.2d at 767 (holding that, *in civil cases*, "upon a finding of gross indifference to or reckless disregard for the relevance of the evidence to a possible claim, the trial court must submit the issue of lost evidence to the trier of fact with corresponding instructions allowing an adverse inference").

[40] *Id.* at 766 ("Even courts eschewing a bad faith standard have acknowledged that the destruction must transcend ordinary negligence, and evince at least knowing disregard of the importance of the document to an opposing litigant's claim."); *cf.*

Mr. Walker emphasizes that Metropolitan Police Department General Orders required the police to preserve cars used to commit robberies.[41] In the absence of a justification for deviating from those General Orders, this is an indication the police negligently breached a duty of care in releasing the Jetta to Mr. Hall when they did. But nothing in the record indicates more than simple negligence in the police action here. To the contrary, we can see why the police overlooked the need to hold on to the Jetta for defense inspection. The police had apprehended all four of the car's occupants as they fled from it, so the arrestees' presence in the vehicle did not appear to be in question. Whoever stole the Jetta did so without having to break into it or punch out its ignition, so the vehicle's physical condition also did not appear to be in issue. The police had searched the Jetta once, before they towed it away, and had recovered from it the wallet stolen in the first robbery; there was no obvious need to search it again. Rather, the police had a legitimate incentive to return the Jetta expeditiously to its rightful owner once they no longer saw a reason to hold it.[42] The

*Smith v. United States*, 169 A.3d 887, 891, 894, 898–99 (D.C. 2017) (holding that trial court did not abuse its discretion by imposing lesser sanctions on government for grossly negligent failure to preserve evidence in violation of Criminal Rule 16).

[41] *See* MPD General Order 304.08 ("Collection of Physical Evidence") (April 30, 1992) at 5–6; MPD General Order 602.01 ("Automobile Searches and Inventories") (May 26, 1972) at 11.

[42] *See In re Q.D.G.*, 706 A.2d at 38 n.6.

police evidently made a careless mistake in not realizing the potential materiality of the Jetta to defense preparation and not strictly complying with General Orders, but — so far as appears — it was not a grossly negligent mistake.

In *Smith v. United States*, this court "perceive[d] no less than gross negligence" where the police and the prosecutor *both* were careless in failing to preserve evidence they *knew* or should have known to be important and in danger of being lost.[43]  Mr. Walker argues that this case is comparable to *Smith*, in that the

---

[43]  169 A.3d at 894.  In *Smith*, police responding to the scene of a domestic dispute found Mr. Smith seated on a couch at his girlfriend's apartment.  *Id.* at 890.  As Mr. Smith had no pants on at this time, his girlfriend told the officers he had a pair of shorts in her bedroom, though he denied they were his.  *Id.*  The police discovered illegal drugs in the shorts, ordered Mr. Smith to put them on, and — instead of retaining possession of the shorts — took photographs of Mr. Smith wearing them.  *Id.*  Those photographs, later introduced in evidence against Mr. Smith to prove his possession of the drugs, appeared to show that the shorts fit him.  *Id.* at 891.  By then, however, the shorts had been lost.  *Id.* at 890.  At the jail following his arrest, Mr. Smith had exchanged the shorts for prison garb, and the jail later destroyed them pursuant to its policy not to hold onto inmate clothing for more than fifteen days.  *Id.*  The loss of the shorts impaired Mr. Smith's ability to show at trial that the shorts did not fit him and were not his.  *Id.* at 896.  The trial court found that the police were negligent in not seizing the shorts.  *Id.* at 893.  This court held that the prosecutor was negligent, too, because, from the probable cause affidavit proffered to the court following the arrest, the prosecutor knew of the unseized shorts and their evidentiary significance when they still could have been secured.  *Id.* at 893–94.  As the trial court remarked, the "U.S. Attorney's Office would have understood the evidentiary significance of those shorts" and "probably should have gotten a search warrant" to seize them.  *Id.* at 893.  We concluded that, based "*on this record*, given the failure [of] not just one, but two, responsible government

United States Attorney's Office carelessly failed to ensure the police preserved the Jetta after defense counsel served a prosecutor at Mr. Walker's presentment with a letter requesting preservation of evidence.

We disagree. The record here does not show that anyone in the United States Attorney's Office was negligent or responsible for the police failure to preserve the Jetta. This is not a case like *Smith*, in which the police and the prosecutor knew or should have known at the time of presentment that critical evidence needed to be retrieved or might be lost. For one thing, the *pro forma* evidence preservation letter that defense counsel handed the prosecutor at Mr. Walker's presentment (on which Mr. Walker bases his argument) did not identify the potential evidentiary significance of the Jetta or its contents, nor did it express any interest on the part of the defense in inspecting the car. The letter did not mention the Jetta at all; it merely recited, in general terms, the government's Rule 16 duty to preserve material evidence within its possession, custody, and control. Even if the prosecutor had been aware of the Jetta's potential evidentiary relevance so early in the case, the prosecutor would not have had reason to fear the police would fail to retain possession of the car. It would have been reasonable for the prosecutor to expect the

---

departments to assure the required preservation, we perceive no less than gross negligence by the government." *Id.* at 894 (emphasis added).

police to follow MPD General Orders and preserve the Jetta as a matter of course. The police then unexpectedly released the Jetta to Mr. Hall only three days after the presentment. There is no indication the police notified the United States Attorney's Office before doing so, or that a prosecutor was or should have been aware the police might release the Jetta within that three-day period.

For the above reasons, we hold that the trial court did not abuse its discretion by denying Mr. Walker's request for a missing evidence instruction.

## III.

We turn to Mr. Crocker's claims of error. He argues that the trial judge erred by curtailing his cross-examination of A.B. for bias, and by permitting the prosecutor to vouch for the credibility of A.B. and Ms. Robinson.

### A. Cross-Examination of A.B. for Bias

Mr. Crocker claims the trial judge impermissibly prevented defense counsel from cross-examining A.B. about what she believed the prosecutor could do to disrupt her detention at the New Beginnings residential center if she did not testify favorably for the government. We conclude the record does not support this claim.

In cross-examining A.B., Mr. Walker's counsel asked her, "You don't want these prosecutors to screw . . . up [your progress at New Beginnings] for you?" A.B. responded, "No." Counsel then asked A.B., "You know they can pick up the phone and call?" The prosecutor objected to that question as "suggest[ing] that we have some ability to alter her placement[,] which we have no authority to do." In the bench colloquy that followed, Mr. Walker's counsel did not dispute the prosecutor's assertion and said he only sought to ask A.B. whether she "*believe[d]* they could pick up the phone and call DYRS?" (Emphasis added.) The judge approved counsel's rephrasing of the question, observing that if the prosecutor believed A.B. "came in here and perjured herself, [the prosecutor] could call[, but] we don't know what the consequence of that would be." The prosecutor asked the judge to give a curative instruction, "[b]ecause as it looks now it looks like [A.B.'s] a cooperator and like we have some ability to control." The judge proposed to leave such an instruction to the end of A.B.'s testimony (saying it might be unnecessary) and admonished defense counsel to avoid implying that prosecutors with the United States Attorney's Office "were in control of [A.B.'s] fate."

Resuming his cross-examination, Mr. Walker's counsel asked A.B., "You believe that the prosecutors can screw this up for you?" There was no objection, and A.B. answered, "Yes." Then, however, defense counsel proceeded to ask A.B.,

"They could pick up the phone and call New Beginnings; right?" A.B. again answered in the affirmative, and as counsel started to ask, "They could tell them that —," the judge interjected, "No. Your question is you believe."

At that point, the trial judge intervened to "clear this up right now" by instructing the jury as follows:

> Ladies and gentlemen, *it's totally appropriate for defense counsel to explore what the witness' beliefs are because it would go to potential bias in her testimony* [(emphasis added)]. It's important that you understand though that these prosecutors are not the prosecuting officials for the juvenile justice system. They are not directly in control of anything about her commitment or that prosecution.
>
> Anybody, I could pick up the phone, you could pick up the phone. Anyone could pick up the phone and then those officials would decide what to do with that information and you could make of that what you want. But it's just very important for you to understand that they're not the prosecuting officials.
>
> *But it's also perfectly appropriate to ask questions about what her beliefs are* [(emphasis added)].

The judge then addressed counsel and asked, "Is that satisfactory to everyone?" Defense counsel said it was satisfactory and made no objection or request at that time. The prosecutor likewise expressed satisfaction with the curative instruction.

Defense counsel returned to questioning A.B. about what she believed the prosecutors could do to affect her progress at New Beginnings, and the trial court allowed the inquiry:

> Q. What do you think would happen if the prosecutors called . . . your social worker and told her that you perjured yourself?
>
> [Prosecutor]: Objection, Your Honor.
>
> THE COURT: *Overruled* [(emphasis added)].[44]

Later in the examination, defense counsel elicited another objection from the prosecutor by asking A.B., "You know that the U.S. Attorneys while they're not the people that prosecute you in juvenile court they have more power than a regular person to affect what's going on in your life; right?" Before the judge could respond to the objection, defense counsel undertook to rephrase it, saying "You believe that; correct?" The judge again allowed the inquiry, saying counsel could restate the whole question. Counsel then asked A.B., "You believe that these prosecutors while they're not the prosecutors that prosecute juvenile court have more power than the average person to affect your life?"[45]

---

[44]  A.B. responded, "I don't know what she [her social worker] would say but I don't think she would believe it."

[45]  A.B. responded, "I don't know."

After the examination of A.B. ended and the witness was excused, Mr. Walker's counsel objected to the judge's jury instruction. Counsel did not challenge the instruction's factual correctness, but asserted that it conveyed the "impression" that the judge was not "impartial" because the judge had "stepped outside of [her] role and rehabilitated the witness prior to redirect by instructing the jury that these prosecutors don't have any more ability to affect her life than any other person." The judge disagreed.[46] However, to be sure the jury was not confused, she later instructed the jury as follows:

> I previously instructed you that the U.S. Attorney's Office[,] the prosecutor in this case[,] is not the prosecutor that prosecuted the juvenile [A.B.]. Thus I told you that the U.S. Attorney's Office does not directly control [A.B.'s] commitment. I informed you however that these prosecutors like anyone else could nonetheless contact DYRS officials with information. And it would be up to [those] officials to decide what to do with that information. I also advised you that it is up to you to determine what to make of that situation.

---

[46] Among other things, the judge pointed out that counsel did not quote the instruction accurately. Counsel then correctly recalled the judge merely said that "anyone could call up DYRS if they wanted to," and that "these prosecutors have no control" over A.B.'s juvenile commitment. Counsel went on to assert that it would have been "proper" for the court to let the government bring those facts out in redirect "if they wanted to do that." Counsel opined that the jury would have gotten the "impression" from the judge's instruction that "defense counsel was engaging in an attempt to trick the jury or to give them the misimpression that these prosecutors had control." Counsel did not substantiate this claim or the related claim of apparent partiality.

Just to be clear. *What matters in this case is not influence the U.S. Attorney[']s Office does or does not actually have with [A.B.'s] commitment. What matters is what [A.B.] believes about what influence the U.S. Attorney's Office has over her commitment* [(emphasis added)]. And what impact if any those beliefs have on the testimony she has given. Those issues are for the jury to determine.

It is clear from the record that the trial judge did not curtail defense counsel from pursuing a proper line of cross-examination for bias. Nor did the judge improperly "step outside her proper role" to "rehabilitate" A.B. on behalf of the government, or implicitly charge Mr. Walker's counsel with trying to trick or mislead the jury. The judge simply exercised her discretionary authority "to impose reasonable limits on [bias] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[47] The specific concern

---

[47] *Austin v. United States*, 64 A.3d 413, 418 (D.C. 2013) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also Clayborne v. United States*, 751 A.2d 956, 963 (D.C. 2000) ("The evaluation and weighing of evidence pertaining to bias for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision. An exercise of judicial discretion will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable." (cleaned up, with citations omitted)).

that the judge addressed here was relevancy.[48] As the judge explained, the relevant question bearing on whether A.B. had a motive to curry favor with the prosecution — and the question A.B. was qualified to answer — was not the actual power *vel non* of prosecutors from the United States Attorney's Office to affect the conditions of A.B.'s detention, but whether A.B. subjectively believed they had such power. The judge permitted defense counsel to fully explore A.B.'s beliefs on that score (and with *no* judicial "rehabilitation" whatsoever of the witness). All the judge did was prevent counsel from conveying in his assertive questions what the judge reasonably feared would be a false or misleading impression that the United States Attorney's Office in fact had direct control over A.B.'s commitment. In the trial court, Mr. Walker's counsel did not deny that his questioning of A.B. could have instilled such an impression.

Nor did defense counsel claim the federal prosecutors actually had the power to "screw up" A.B.'s progress at New Beginnings (as Mr. Walker's counsel put it), or that the judge's curative instructions were otherwise factually erroneous. When the judge afforded opportunities to counsel to object to those instructions, defense

---

[48] *See Austin*, 64 A.3d at 420 ("While evidence of bias of a principal prosecution witness is a proper subject of cross-examination, the proposed area for questioning must meet relevancy standards.").

counsel proffered no basis for a genuine belief that they were factually erroneous, or that the United States Attorney's Office really could influence the conditions of A.B.'s detention – despite the prosecutor's specific objection to and denial of this apparent premise of the cross-examination.[49] Mr. Crocker asserts in his brief on appeal that "[a] call from a prosecutor at the U.S. Attorney's Office does, in fact, likely carry greater weight with New Beginnings, than a call from a random citizen," and that "[t]he power of a prosecutor, who could tell the rehabilitative agency that their ward was not being honest in a court of law, is actually quite strong." But Mr. Crocker offers nothing to justify these bare assertions (setting aside that they do not accurately refute what the judge actually instructed the jury), they are unsupported by any evidence or argument at trial, and we have no reason to accept them at face value.

We therefore reject Mr. Crocker's argument that the trial judge impermissibly curtailed the cross-examination of A.B. for bias.

---

[49] *See Clayborne*, 751 A.2d at 962-63 ("The examiner may not manufacture allegations of bias out of thin air or insinuate facts that she knows or believes are false. . . . The examiner must have a reasonable factual foundation, . . . or at least a 'well-reasoned suspicion' that the circumstances indicating bias might be true. . . . If opposing counsel objects to bias cross-examination based on a claimed lack of foundation, the examiner must proffer to the court for its evaluation the basis for her genuine belief that her questioning is well-grounded and hence that the answers may be probative of bias.").

## B. Impermissible Vouching

In their closing arguments, defense counsel forcefully attacked the credibility of A.B. and Ms. Robinson. They urged the jury not to believe A.B. because she was motivated to curry favor with the prosecution to avoid retribution that would exacerbate the conditions of her detention. As for Ms. Robinson, both defense counsel attacked her as a liar. Mr. Crocker's counsel called her "in her core a dishonest person." Mr. Walker's counsel told the jury she "lied through her teeth." And both counsel argued that, under Ms. Robinson's cooperation agreement, she was compelled to testify to whatever the government wanted her to say was true.

In rebutting these assertions, the prosecutor made a number of statements to the effect that A.B. and Ms. Robinson were telling the truth. Mr. Crocker now argues that the prosecutor's statements constituted impermissible prosecutorial vouching for the witnesses' credibility based not on the evidence at trial but on the prosecutor's personal opinion. "[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis

of the evidence presented to the jury."[50]  It also is feared that a prosecutor's expressed opinion "may induce the jury to trust the Government's judgment rather than its own view of the evidence."[51]  The government responds that the prosecutor's statements in this case were linked to evidence supporting them and thus did not raise the concerns animating the prohibition on prosecutorial vouching.

We will not exhaustively describe and evaluate each statement made by the prosecutor in rebuttal argument.  Assuming without deciding that some of the prosecutor's remarks could have been understood as inappropriate vouching for the credibility of A.B. or Ms. Robinson, we nonetheless reject Mr. Crocker's claim on appeal.  That is because his counsel did not object to the remarks at any point in the trial court proceedings, and his claim does not survive the rigors of plain error review.  To obtain relief on a claim of error forfeited in the trial court, "the appellant [must] show that (1) the judge erred (or abused his discretion); (2) the error was clear or obvious; and (3) it affected the appellant's substantial rights."[52]  "If all three conditions are met, an appellate court may then exercise its discretion to notice a

---

[50]  *United States v. Young*, 470 U.S. 1, 18 (1985).

[51]  *Id.* at 18–19.

[52]  *Simmons v. United States*, 940 A.2d 1014, 1024 (D.C. 2008).

forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[53] Even assuming *arguendo* that the judge clearly erred by not intervening *sua sponte* in the government's rebuttal argument — a dubious proposition — Mr. Crocker has not demonstrated that the judge's failure to do so affected his substantial rights, i.e., that there is a "reasonable probability that the . . . [error] had a prejudicial effect on the outcome of his trial."[54] Simply put, the government's case against Mr. Crocker was overwhelming, and he has failed to demonstrate a reasonable probability that, absent the prosecutor's alleged statements of personal opinion, the result of his trial would have been different.

## IV.

In sum, we hold that the trial court did not abuse its discretion in declining to give a missing evidence instruction as a sanction for the government's violation of Criminal Rule 16. We also hold that the trial court did not curtail proper bias cross-examination or plainly err in countenancing the prosecutor's remarks in rebuttal argument. Accordingly, we affirm appellants' convictions.

---

[53] *Id.* (quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006)).

[54] *Thomas*, 914 A.2d at 21.